Laurie K. CHESSER–WITMER,
Appellant,

v.

Michael A. CHESSER, Appellee.

No. S–11512.

Supreme Court of Alaska.

July 15, 2005.

Gloria Hanssen Hooper, Law Office of Rita T. Allee, P.C., Fairbanks, for Appellant.

Michael A. Chesser, pro se, Fort Drum, New York.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## *OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A custody order gave ex-spouses joint legal and shared physical custody over their young daughter. Two years later, upon learning that the Army was transferring him to New York, the father moved to modify custody, seeking physical custody of the child during the school year. The superior court granted the modification. The mother appeals, arguing that the superior court erred in its factual findings and abused its discretion in granting the modification. Because the superior court's factual findings are supported by substantial evidence and are not clearly erroneous, and because the trial court did not abuse its discretion in making the custody determination, we affirm.

## II. FACTS AND PROCEEDINGS

Michael and Laurie Chesser[1] married on December 24, 1997 in Tennessee. Michael has been in the Army since 1991. During the marriage, Michael was stationed at Ft. Wainwright, near Fairbanks. Their only child, Bryanna, was born on September 16, 1998. Michael and Laurie separated on January 9, 2001, and two days later Laurie filed

---

1. Laurie Chesser has remarried and is now known as Laurie Chesser–Witmer. For simplici-
ty, we refer to the ex-spouses by their first names.

a complaint for divorce. Both parents requested primary physical custody of Bryanna.

After a two-day trial, Superior Court Judge Richard D. Savell issued a Decree of Divorce and Findings of Fact and Conclusions of Law on December 12, 2001. With regard to child custody, the order concluded that it was in Bryanna's best interest to give the parents joint legal custody and shared physical custody. It set forth a detailed schedule, as follows:

A. Mr. Chesser shall exercise physical custody from Friday evening until Sunday evening and from Wednesday evening until Thursday morning. Ms. Chesser shall exercise physical custody from Sunday evening until Wednesday evening and from Thursday morning until Friday evening.

B. [I]n addition ... Mr. Chesser will exercise a three-overnight weekend one time a month. . . .

C. The times for exchanges ... shall be set by agreement of the parties.

D. Both parties will be entitled to take a two-week vacation with the minor child outside the Fairbanks area. . . .

Though Laurie was not denoted as the primary custodian in the order or elsewhere, this schedule gave Laurie slightly more physical custody than Michael. The court ordered this arrangement in part because it anticipated that Michael would be unavailable for up to seventy-five days per year due to military deployment. The order also provided that "if either parent needs child care for a period of two hours or longer, the other parent must be given the opportunity to care for the child if that parent is available." [2]

About one year after entry of this order, Michael moved for modification of the custody schedule. Because his position in the Army had changed to "Permanent Rear Detachment"—a position with apparently no risk of deployment—Michael requested an exactly equal share of physical custody. His calculation asked for an additional fourteen to fifteen days per year.[3] On March 3, 2003 Judge Savell denied Michael's motion.

In January 2004 Michael learned that the Army planned to transfer him to Fort Drum, New York the following summer. Wanting to take Bryanna with him and have custody during the school year, Michael again filed for modification. He proposed that Laurie have custody during summers and holidays. Michael sought modification based on his impending transfer and based on Laurie's alleged violations of the existing court order and parenting behavior alleged to negatively affect Bryanna's welfare. He attached a list of these violations, and later supplemented the list. He alleged that Laurie frequently left Bryanna in a third party's care for two or more hours without first contacting Michael, and that Bryanna was often not available for telephone contact during their agreed-upon times. He also claimed that Bryanna's personal hygiene and health suffered while she was with Laurie, that her school performance was substandard, including numerous tardy arrivals, and that she was harmed by other conduct of Laurie.

Laurie opposed the motion, arguing that Michael's complaints were exaggerated or unfounded and that Michael's own conduct had been less than ideal. She pointed out that, since the divorce, Michael had moved seven times, had numerous girlfriends, drank excessively, and had been convicted of driving while intoxicated.

Trial on Michael's motion to modify custody was held in May 2004. Testimony at trial supported the pretrial allegations of both parties: principally, that Laurie had violated the existing court order regarding Bryanna's contacts with her father, and that Michael had problems with alcohol and had experienced instability in his living arrangements. The trial also showed the following.

---

2. There was also a provision that, if one parent decided to leave the Fairbanks area, the parents "will participate in at least three sessions with a mediator" before resorting to the courts. This provision was ignored in this case. Michael claimed that mediation was impossible, given the unwillingness of Laurie to communicate and the short time frame. In any case, Laurie has not at any time objected to the noncompliance with this provision.

3. He asked for overnight custody every other Tuesday evening.

Laurie runs an assisted-living facility for the elderly out of her home. The assisted living home comprised the top floor of the house, while the family (including Laurie, her husband, her step-son, and Bryanna) occupied the lower floor. The business normally housed between two and four patients, with a staff of two employees. Laurie regularly used one of the business's employees to babysit Bryanna. On one occasion, an elderly patient "napped" in Bryanna's bed for about forty-five minutes. Laurie testified that the living situation was good for Bryanna because it allowed Laurie to work mostly at home.

Two of Michael's ex-girlfriends testified regarding his drinking habits and occasional argumentative/aggressive behavior. In addition, Laurie's husband testified that Michael had referred to Laurie in a derogatory manner. However, there was no clear testimony that such behavior occurred while Michael was in Bryanna's presence. Michael conceded that his living situation had been unstable, but suggested that his situation had improved—he was in a serious committed relationship that included discussion of marriage. Michael and his girlfriend both testified about their strong connection with Bryanna.

There was extensive testimony that communication between Laurie and Michael had broken down. Michael testified that he felt like Laurie was more likely to give additional visitation when their relations were going well, and less likely to do so when they were not. Michael testified that, by his calculations, there were seventy-two violations of the custody provision regarding babysitting, and forty-four occasions when Bryanna was not available to talk on the telephone.[4] He also complained that Laurie failed to inform him about Bryanna's school performance, or involve him in the decisions to enroll Bryanna in the Sylvan Learning Center and in private therapy.

There was no expert testimony presented at the trial. Bryanna's therapist testified that the primary source of Bryanna's unhappiness was the conflict between her parents. However, she noted that Bryanna was generally fine and enjoyed a "very, very strong relationship" with both parents and stepparents. She also testified that:

> If [Bryanna] stayed with her mother, she was going to be devastated by dad moving and being so far away. And if she moved with dad, she was going to be devastated that mom and brother were going to be so far away.

Bryanna's therapist also testified that Bryanna was happy about moving with her father, but that she was sad because she said her father had told her that she would never see her mother again. Though the therapist said it would have been advantageous to have full-family counseling, she did not involve Michael because of her negative impression of him during their first and only meeting.

Following the trial, Judge Savell modified custody in favor of Michael. He found a substantial change in circumstances based both on Michael's impending move and on other changes relating to the statutory best interest factors. He emphasized certain facts: that Laurie had "abused the authority she has had" by inadequately sharing co-parenting responsibilities; that living in a house with an assisted-living facility may not have been a healthy environment for Bryanna; and that Laurie failed to be fully open with Michael on parenting issues, which caused an increase in distrust. Judge Savell concluded that Michael's alcohol use, while a concern, was not a "negative mark" on the custody scale because it was not done in front of Bryanna and was not shown to have affected her.[5] He also found that there was no domestic violence and that it was "significant" that the therapist testified "without criticism, contradiction or hesitation" that Bryanna was excited to go with her father.

---

4. Telephonic visitation usually occurred between 5 and 7 p.m. This time is not memorialized in any court order. Michael claimed that it may have been suggested by the court, and that at least it was the accepted practice of the parents.

5. In Judge Savell's words, "we don't care what people do as long as they're not doing it in front of and with the child."

Judge Savell stated that the case was "extremely close" and that "no independent factor" led to his conclusion. He concluded that the two factors "tipping" the balance were (1) the "unhealthy, excessive exposure to and reliance upon the home health care business," and (2) Laurie's "abuse of authority" and interference with an "open, frequent, loving relationship" with Michael. He concluded that: "it is in the child's best interest and ... both parents will have greater access ... if the child is given a chance to reside with Mr. Chesser in Fort Drum."

Judge Savell gave many additional instructions to the parents, including that Bryanna was to remain with Laurie during the summer until Michael was settled in New York and that if Michael was later deployed, Bryanna would return to Laurie. Most significantly, the court provided that the modified custody order, though a final order, had a "one year duration and no more." He ordered the parents to file status reports by May 1, 2005, "setting forth their respective personal progress and the successes or failures they have had in co-parenting their child." Judge Savell's rationale behind this arrangement was to "reverse the roles" to raise each parent's standards of conduct. He instructed Michael that he should "demonstrate how [parenting] is supposed to be done" and that if he abuses his custodial power, he will quickly lose it.

Judge Savell subsequently denied Laurie's motions for reconsideration and for stay of enforcement. Laurie then sought emergency supreme court reconsideration of the order denying the motion for stay pending appeal, which we denied in August 2004. This appeal followed.

## III. STANDARD OF REVIEW

█ "The trial court has broad discretion in child custody decisions. A trial court's determination of custody will be set aside only if the entire record demonstrates that the controlling findings of fact are clearly erroneous or that the trial court abused its discretion."[6]

█ "A finding of fact is clearly erroneous when this court is left with a definite and firm conviction that the trial court has made a mistake. Abuse of discretion is established if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[7]

## IV. DISCUSSION

### A. The Trial Court's Findings of Fact Were Not Clearly Erroneous.

Laurie argues that two of the trial court's "primary" factual findings were clearly erroneous: (1) that the assisted living home was harmful to Bryanna and (2) that Laurie interfered with Michael's relationship with Bryanna.

### 1. Assisted living home

█ The trial court found "an unhealthy, excessive exposure to and reliance upon the home health care business with this child." Judge Savell noted that it is "not always a pleasant business" and that patients wander, act unpredictably, and ultimately die. He agreed with testimony that clients should not be present in the residential quarters and expressed worry that a client had napped in Bryanna's bed. He also expressed concern that "employees of a care facility [were] substitute parents" and stated: "you can't rely on the charges, the wards, the elderly patients for whom you care to be a social outlet, friends, roommates or bed-mates of a child."

While acknowledging that she operates an assisted living home, Laurie argues that it should be a "non-issue." She points to the testimony of Ms. Kathleen Evans, a care coordinator for the state, for the proposition that the contact between Bryanna and the patients is actually beneficial. She also complains that Michael's testimony provided the only evidence of any detriment, and that this evidence consisted only of the one-time nap incident.

6. *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002).

7. *Id.*

The facts in the record were sufficient for the court to find the assisted living home a "concern." There was evidence of troubling aspects of this living arrangement, even if it was something of an exaggeration to refer to clients as Bryanna's "social outlet, friends, roommates." First, Laurie conceded that a client had indeed napped in Bryanna's bed for forty-five minutes. Her excuse—that the client wanted to watch "I Love Lucy" and there was apparently no other television available—did not satisfy the trial court. Although there was no evidence that this incident negatively affected Bryanna, she found it significant enough to mention to Michael. Second, the evidence showed that one of Bryanna's regular babysitters was an employee of the facility. As Laurie was enrolled in classes and held a second part-time job, Bryanna was often in the employee's care before or after school. Third, Bryanna's excessive school tardiness was in part due to the operation of the facility—Mr. Witmer could not drive Bryanna to school until an employee arrived for the morning shift, since elderly clients cannot be left without some supervision.

Laurie attempted to offset this evidence with the testimony of Kathleen Evans. Ms. Evans, the care coordinator for the state, made regular biweekly visits to the care facility as part of her job, but she never saw the downstairs living quarters. She gave her personal opinion[8] that small children living in such a setting will not be traumatized if the parents "handle it correctly." She explained that children could form bonds with the clients, and that if children are "talked to and told about the cycles of life, ... they can handle it ... just as if ... their father died or the brother died or a dog died." She added that the patients normally die in the hospital, not in the house. The testimony of Ms. Evans was apparently not entirely convincing to Judge Savell. It is the function of the trial court, and not this court, to determine the weight and effect of the testimony.[9]

Ms. Evans's testimony can be viewed as supporting the notion that living in a home containing an assisted living facility could present unsettling and even frightening situations for a child, if not handled correctly. Combined with the "napping" incident, the employee babysitting, and the late arrivals to school, we conclude that the court did not clearly err in finding this living arrangement a "concern" and assigning some weight to it.

### 2. Interference with Michael and Bryanna's relationship

The trial court also found an "abuse of authority that has let emotional involvement get in the way of [Laurie's] ability to allow an open, frequent, loving relationship and has interfered with that by making decisions and taking actions unilaterally and ... interfering with or not facilitating the communication that had become a pattern." Similarly, Judge Savell found that Laurie failed to adequately co-parent by relying upon the employee, rather than Michael, to babysit Bryanna, and that her "irrational and emotional" responses obstructed communication and deepened mutual mistrust. Rather than make specific findings regarding particular symptoms of Laurie and Michael's antagonism, such as the number of missed phone calls, the court stressed it was more important "to examine the behavior of the parties in what each side acknowledges to have become a practice." The judge thought Laurie viewed Michael as "a pain in the neck" and figured it was easier "not to deal with him." Consequently, she let such feelings "get in the way" of Michael and Bryanna's relationship.

On appeal, Laurie seems to argue that there was no interference because Michael enjoyed ample visitation. She notes that he enjoyed 171 overnights in 2003, that she regularly accommodated his scheduling needs, and that she even let him stay in the Witmers' guest house on occasion to be closer to Bryanna. She also claims that any interferences with babysitting were "at best technical violations of the order."

---

**8.** Ms. Evans conceded that her personal opinion was "not professional because I do not work with children ... as my primary job."

**9.** *Evans v. Evans,* 869 P.2d 478, 480–81 (Alaska 1994).

These arguments miss the mark. The point is not whether Michael has had enough visitation and contact—the question is whether Laurie's acts interfered with the relationship. There was testimony suggesting that she arbitrarily refused consent for Michael to take Bryanna on a Canadian vacation. Moreover, Michael testified that Laurie interfered with his babysitting opportunities seventy-two times and his telephone contact forty-four times. While she argues that some of these instances may be exaggerated or unfounded, she generally gives no response or excuse for her actions, and even concedes that some were violations of the custody order (when she called them merely "technical"). In light of the evidence that Laurie obstructed Michael from co-parenting, we conclude that the trial court's finding of interference was not clearly erroneous.

## B. The Trial Court Did Not Abuse Its Discretion in Granting the Modification.

Laurie's final contention is that the court abused its discretion by modifying the custody order. She argues that it failed to consider all of the factors mandated by statute and assigned disproportionate weight to one factor while ignoring others. More specifically, she maintains that the court failed to adequately consider the factor regarding stability and continuity of the relationship with the child.

An award of child custody or visitation may be modified if the court determines that: (1) "a change in circumstances requires the modification of the award" and (2) "the modification is in the best interests of the child."[10] The court must "enter on the record its reason for the modification."[11] The moving parent bears the burden of showing a "significant or substantial" change in circumstances.[12] Such a change exists as a matter of law when a custodial parent moves out of state.[13] This rule includes custodial parents who have joint custody.[14]

The trial court in this case found a substantial change in circumstances based on Michael's move and on "other changes" relating to the statutory best interest factors (presumably, parental decisions impacting Bryanna's welfare). Because the out-of-state move was a sufficient ground upon which to satisfy the statutory requirement, we need not review the second ground. Michael is a custodial parent, and it has not been alleged that his move had an illegitimate purpose.[15] Moreover, Laurie does not argue on appeal that the court erred in finding a substantial change in circumstances. Thus, our review addresses only whether the court's "best interests" findings were an abuse of discretion.

In determining the best interests of a child, a court is required to consider the nine factors of AS 25.24.150(c).[16] These factors include:

(1) the physical, emotional, mental, religious, and social needs of the child;

(2) the capability and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the willingness and ability of each parent to facilitate and encourage a close and

10. AS 25.20.110(a).

11. *Id.*

12. *Barrett v. Alguire*, 35 P.3d 1, 5–6 (Alaska 2001).

13. *Id.* at 6.

14. *See McQuade v. McQuade*, 901 P.2d 421, 423–24 & n. 6 (Alaska 1995); *see also Meier v. Cloud*, 34 P.3d 1274, 1279 (Alaska 2001).

15. An out-of-state move is legitimate when it is "not primarily motivated by a desire to make visitation … more difficult." *Moeller–Prokosch v. Prokosch*, 53 P.3d 152, 157 (Alaska 2002) (citation omitted).

16. AS 25.20.060(a).

continuing relationship between the other parent and the child . . .;

(7) any evidence of domestic violence, child abuse, or child neglect . . . or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

In performing such analysis, a trial court

need not "specifically address the statutory factors . . . and make explicit 'ultimate' findings that the best interests of the children require the custodial disposition reached," but its findings *"must either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved."* [17]

Similarly, we have stated that "courts need not memorialize their findings for each given factor. Where there is 'no substantive dispute' about a certain factor, the court need not specifically address it." [18]

■ The superior court in this case did not make findings regarding each statutory factor, but the language of its analysis makes clear that it properly considered all factors. The court found that two considerations tipped the balance in favor of Michael. The first consideration was Laurie's failure to share co-parenting duties and her interference in Michael's relationship with Bryanna, which demonstrated an unwillingness to allow an open and loving relationship between Bryanna and Michael. The second consideration was Bryanna's exposure to certain facets of Laurie's assisted living facility, which raised a concern about Laurie's ability to meet Bryanna's physical, emotional, mental and social needs.

The court also briefly addressed the other statutory factors. It found that Michael's alcohol use did not impact Bryanna and was not severe enough to be a "negative mark." It found no domestic violence. It found Bryanna too young to consider her placement preference, though it did find "significant" that testimony recounting Bryanna's excitement at the prospect of living with her father was not challenged. The court found the factors of stability and continuity to be inapplicable because Michael's move rendered actual stability impossible—either way, Bryanna would lose some contact with one parent. The court also suggested that the parenting history and ability of the parents were roughly equal: "Neither parent is a bad parent. Neither parent is an Olympic gold medalist."

In short, though the court did not explicitly place these findings within the structure of the statutory list, we can easily glean the trial judge's thoughts on each statutory factor. As a result, we conclude that the court properly considered all factors and acted within its discretion.

Laurie's argument to the contrary is that the court erred in failing to adequately consider Bryanna's need for stability, instead relying solely on Laurie's interference with Michael's relationship with Bryanna.[19] She argues that the court mentioned "stability" only in passing and purely in a geographical (not emotional) sense. She also notes that a move to distant New York will remove Bryanna from her "home community, mother's family, sibling, school, counselor, and all that is familiar to Bryanna."

There is, of course, a certain difficulty in the determination of "stability" where an out-of-state move will necessarily disrupt the sta-

---

**17.** *Smith v. Weekley,* 73 P.3d 1219, 1225 (Alaska 2003) (citing *Borchgrevink v. Borchgrevink,* 941 P.2d 132, 139–40 (Alaska 1997)) (emphasis added).

**18.** *Virgin v. Virgin,* 990 P.2d 1040, 1045 (Alaska 1999) (citation omitted).

**19.** She cites to *Platz v. Aramburo,* 17 P.3d 65 (Alaska 2001), for the proposition that custody cannot be transferred solely on the ground of factor (6) (interference). Laurie misreads the *Platz* case. Unlike the superior court in this case, the court in *Platz* did not conduct a "best interests" hearing. Instead, the court transferred custody based largely on one parent's refusal to cooperate with a visitation order. We reversed the custody order and remanded for an evidentiary hearing regarding the AS 25.24.150(c) best interest factors.

tus quo.[20] We have noted that a "continuity test centered entirely on the child's geographic stability would always favor placing the child with the non-moving parent."[21] As a result, we have indicated that it is "impermissible" to treat the move itself (assuming it is a legitimate move) as a best-interests factor weighing against the moving parent.[22] Instead, in these situations a court must examine "not only the desirability of maintaining geographical continuity, but also the importance of maximizing relational stability."[23] In other words, the court may properly award custody to a parent who offers "superior emotional stability."[24]

In the present case, the trial court properly found that the stability of Bryanna's life will be disrupted regardless which decision it makes. Laurie is right that removing Bryanna from her current home will alter her relationships with her mother, friends, school, extended family and sense of place. It is also true that rejecting Michael's motion for modification would change Bryanna's relationship with her father and, perhaps, cause an equally or even more damaging disruption. The superior court examined Bryanna's need for stability and implicitly concluded that awarding Michael custody would not be so much more disruptive to Bryanna's life that this factor outweighed other relevant factors. Laurie has not raised any claims that convince us that this decision was an abuse of discretion.

Laurie also contends that the superior court relied on only one factor. We disagree. The record reflects that the court considered all of the statutory best interest factors. Many of the factors were found inapplicable (e.g., substance abuse, domestic violence, child's preference). Others did not weigh strongly in favor of either parent (e.g., child's

needs, amount of love and affection). The court found two factors weighed in favor of custody to Michael: (1) the parents' respective abilities to meet Bryanna's needs, and (2) their willingness to allow an open and loving relationship between Bryanna and the other parent.

*Hamilton v. Hamilton*[25] presented a similar situation. In *Hamilton*, an ex-husband sought to modify a custody arrangement to make himself the primary custodian after his wife moved with their two sons from Juneau to Tacoma, Washington.[26] The trial court granted the modification based primarily on the wife's interference in the father's relationship with his sons—the mother had not co-operated in sharing parental duties and had acted with the purpose of thwarting the father's access to the children.[27] The trial court concluded that the remaining factors were either not applicable or favored neither parent.[28] Most notably, the court did not explicitly mention the effect of its decision on the boys' interest in stability, but it found the mother's "inability to allow [the father] frequent access to the children, and the stress that this was causing the boys, to be more important than the desirability of maintaining continuity of care" by the mother.[29] We held that the trial court did not abuse its discretion in placing more weight on interference than stability and that it properly considered all best interest factors.[30] The trial court similarly considered all factors in this case. We conclude that the superior court did not abuse its discretion in granting the modification to Michael.

Moreover, the court's findings and conclusions must be reviewed in light of the particular circumstances of this case and the custody arrangement it ultimately issued. We

---

**20.** *Meier v. Cloud,* 34 P.3d 1274, 1279 (Alaska 2001) ("a parent's decision to relocate to another state will ordinarily necessitate a change in the status quo....").

**21.** *Id.*

**22.** *Moeller–Prokosch v. Prokosch,* 53 P.3d 152, 157 (Alaska 2002).

**23.** *Meier,* 34 P.3d at 1279.

**24.** *Id.*

**25.** 42 P.3d 1107 (Alaska 2002).

**26.** *Id.* at 1111.

**27.** *Id.* at 1114, 1116.

**28.** *Id.* at 1116.

**29.** *Id.*

**30.** *Id.* at 1115–16.

have stated that trial courts "have broad discretion to fashion custody awards designed to meet the unique needs of the individuals involved.[31] Here the change in custody was ordered to be for "one year duration and no more." Judge Savell ordered both parents to file status reports on May 1, 2005, setting forth the events since the change and whether the modification arrangements should be altered. Given that these status reports will be filed and another modification hearing may be held at the superior court level, and given that there were no mistakes of law or fact during the modification hearing reviewed today, we decline to undo the current arrangement and interrupt a perhaps more gradual process.

## V. CONCLUSION

Because the superior court's factual findings are supported by substantial evidence and because the court did not abuse its discretion in making the custody decision, we AFFIRM the superior court's modification of child custody in favor of Michael Chesser.

---

**31.** *Deininger v. Deininger,* 835 P.2d 449, 451 (Alaska 1992) (upholding gradual two-year transition period to 50/50 custody).