Phyllis HAMILTON, Appellant,

v.

John HAMILTON, IV, Appellee.

No. S–9826.

Supreme Court of Alaska.

March 8, 2002.

1108

Alan J. Hooper and Gloria Hanssen Hooper, Hooper & Hanssen, Fairbanks, for Appellant.

Paul H. Grant, Law Office of Paul H. Grant, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Phyllis and John Hamilton were divorced in 1999 after nearly nine years of marriage. They agreed that Phyllis should be awarded primary physical custody of their two sons, Francis and Ian. Because of problems communicating with Phyllis regarding his visitation rights and Phyllis's move with the boys to Tacoma, Washington, John filed a motion to modify the custody arrangement. After a trial, Superior Court Judge Michael A. Thompson found that a transfer of primary physical custody to John was in the children's best interests due primarily to Phyllis's inability to foster an open relationship between the boys and John when they were in her custody. Phyllis appeals that determination. Because the trial court did not err in making its factual findings nor did it abuse its discretion in awarding custody, we affirm the trial court's award of custody to John.

## II. FACTS AND PROCEEDINGS

Phyllis and John began dating in 1990 and moved in together in late spring 1991. Their first son, Francis (Frank) was born on June 28, 1991. They married that November. On April 30, 1993, their second son, Ian, was born. Also in 1993 the Hamilton family moved to Petersburg so that John could begin working with the Petersburg Police Department.

After considering separation several times, John moved out of the house on May 1, 1997 and filed a complaint for divorce later that month. Phyllis moved with the boys from Petersburg to Juneau when she obtained a job with the state. Negotiations between Phyllis and John culminated in a property settlement and child custody agreement filed on February 22, 1999. The decree of divorce was entered on March 25, 1999.

John and Phyllis were given joint legal custody of the children, with primary physical custody in Phyllis. John was given visitation during Thanksgiving, winter holiday, spring break, and summer vacation. In addition, John was given "visitation rights if he is in Juneau, provided it is reasonable and does not interfere with pre-planned activities or school attendance, and may have the boys travel to visit him in Petersburg for up to five weekends during the school year, at his expense."

The agreement also gave each parent the right to make decisions regarding day-to-day care and control of the children when the children are residing with that parent, but

major decisions regarding education, medical care, and socialization were to be made jointly. John and Phyllis agreed to a "good faith requirement" to use their best efforts to comply with statements of principle relating to their parenting rights and responsibilities, including working together on providing a sound moral, socioeconomic, and educational environment for the children; promoting the relationship between the children and the other parent; and supporting the other parent's lifestyle in front of the children.

In October 1999 John filed a motion and memorandum to enforce visitation and for sanctions against Phyllis. He claimed that Phyllis had twice violated the child custody agreement by not allowing him to visit the boys when he was in Juneau on business. Phyllis, now acting *pro se*, requested a continuance for her response to John's motion. Before her response was filed, John filed another motion, this time asking that custody be modified. The impetus for this motion was Phyllis's and the boys' move, without notice to John, out-of-state to Tacoma, Washington.[1] Phyllis responded to John's motions and claimed that she was complying with the court-ordered visitation, that her move to Washington was not in violation of the custody agreement, and that John had interfered with her physical custody of the boys.

The trial court agreed that Phyllis's move to Washington justified a re-examination of the custody agreement and issued an interim order keeping the custody agreement in effect with "Washington State" substituted for "Juneau." The trial court also ordered a custody investigation report. A trial on the motion to modify custody was held in July 2000 after the custody investigation report was filed with the trial court.

Following trial, Judge Thompson issued an order granting John's motion to modify custody. He stated that the factor regarding "the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent"[2] was the most important factor in reaching his decision. He then discussed the other factors under AS 25.24.150(c), which he found to be either equal between the parties or not applicable. Judge Thompson adopted the recommendation of the custody investigator with several minor exceptions. Phyllis and John continue to share legal custody, with John having primary physical custody. Phyllis was given visitation during summer vacation, on alternating winter holiday and spring break vacations, with shared travel expenses, and on alternating Thanksgivings, if she takes sole responsibility for the expenses. Once again represented by counsel, Phyllis appealed.

## III. STANDARD OF REVIEW

■ The trial court has broad discretion in child custody decisions.[3] A trial court's determination of custody will be set aside only if the entire record demonstrates that the controlling findings of fact are clearly erroneous or that the trial court abused its discretion.[4]

■ A finding of fact is clearly erroneous when this court is left with a definite and firm conviction that the trial court has made a mistake.[5] Abuse of discretion is established if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others.[6]

## IV. DISCUSSION

### A. The Trial Court Did Not Make Clearly Erroneous Factual Findings.

1. The trial was not about Phyllis's shortcomings in her relationship with John.

■ Phyllis argues that the trial was not about the best interests of the children, but

---

1. Phyllis, who is African-American, argues on appeal that it was important for her boys to have better access to her family and their cultural roots. John is Caucasian.

2. AS 25.24.150(c)(6).

3. *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000).

4. *Id.*

5. *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993).

6. *Gratrix v. Gratrix*, 652 P.2d 76, 80 (Alaska 1982).

instead about her shortcomings in her relationship with John. Rather than considering John's actions, she contends, the trial court only looked at Phyllis's reactions without taking account of the stress she was suffering from John's manipulations and her financial problems. Phyllis points to the trial court's statement that "[i]t was [Phyllis's] adherence to the letter and spirit of [the Good Faith Requirements in the child custody agreement] that prompted two and one-half days of testimony" as evidence of her contention.

The trial was not about Phyllis's shortcomings in her relationship. The trial court heard testimony from nineteen witnesses before issuing its order. Though at times their relationship was discussed, the majority of the testimony of each witness focused on Phyllis's and John's respective parenting of the boys. Aside from its recitation of the collapse of communication between Phyllis and John, the trial court makes no mention of their relationship.[7]

2. **The trial court did not err in finding that Phyllis's and John's relationship slowly deteriorated beyond repair after entering into their property settlement and child custody agreement.**

■ Phyllis finds fault with the trial court's statement in its order that "[f]ollowing entry into the above referenced agreement the parties' relationship, already strained, slowly deteriorated beyond repair." She argues that the record shows that the divorce had been high in conflict from the beginning and that there was no "deterioration" in their relationship.

While the divorce was not an amicable one, communication between the parties became even more tense after John and Phyllis signed the child custody agreement. Eight months after the divorce was final, John filed a motion to enforce his visitation rights and moved for sanctions against Phyllis. In his affidavit, John stated that Phyllis had hung up on him when he had called to arrange visitation for times he would be in Juneau on business. Phyllis did call him back soon afterward but no plans for visitation were agreed to. He then wrote a formal letter and had it served on her by a process server. When no plans were reached, John went to the Juneau Police Department and had an officer accompany him to her house.

In her request for a continuance for her response to John's motion, Phyllis spoke of John's "malicious, unlawful behavior, and his abuse of his law enforcement authority." Furthermore, she complained of his "relentlessly antagonistic, hate-filled, and malicious harassment." As the police had never been called and the rhetoric between the parties had not been as harsh prior to the settlement, the trial court did not err in finding that John's and Phyllis's strained relationship deteriorated after their divorce.

3. **The trial court did not err in finding that all communication between John and Phyllis had collapsed.**

■ Phyllis argues that the court erred in finding that "[p]olite discussion became bickering, then argument, and by eventual declension all communication collapsed." Rather, she contends, the parties had a difficult time communicating at all times following their separation.

The trial court's statement regarding the communication between the parties from the date of their separation is accurate. John described Phyllis as "hostile" towards him, he had a letter formally served on her at work, and he filed a custodial interference report with the Juneau Police Department.

When speaking of John soon after he filed the motion for a change in custody, Phyllis stated that he

> did in fact walk out on us, his own family, cold heartedly and completely without feeling or remorse, after moving us hundreds of miles from any other family members who might give us assistance and support.

---

7. The report prepared by the custody investigator and relied on by the trial court did mention the relationship history of Phyllis and John. But rather than focusing on whose fault the break-up was, the investigator allowed both sides to tell their version of what happened. And the relationship history was a minor part of the custody investigator's report, which concentrated heavily on the best interests of the children.

He in fact abandoned us, he knows it, although he will continue to twist the truth as he does while looking everyone right in the eye. [Emphasis omitted.]

Phyllis's increasing animosity towards John and John's escalating antagonism fairly indicate that communication had badly deteriorated during the separation.

### 4. The trial court did not err in finding that Phyllis advised school personnel not to cooperate with John.

■ Phyllis contends that the trial court's finding that she "advised the boys' school personnel not to cooperate" with John is not supported by the record. Before moving to Washington, the boys attended both Glacier Valley and Harborview Elementary Schools in Juneau. The custody investigator spoke with Frank's and Ian's teachers at both schools, as well as both principals. The investigator's report states that Phyllis told the staff at Glacier Valley not to inform John about any concerns they may have and that they were to deal with her only.

In his testimony, John stated that he had to pry information about Frank's and Ian's progress from three different school administrators. Although Phyllis denies telling Harborview staff to stop John from seeing the boys, when he tried to visit Harborview, he reported a very hostile attitude from the receptionist and office workers. He further reported that Phyllis had not listed him in the boys' paperwork on record at the schools. Phyllis's only response is that the custody investigator and staff at Glacier Valley as well as Harborview are lying, but she gives no reason for them to lie. As such, the trial court's finding that Phyllis advised the school personnel not to cooperate is supported by the record.

### 5. The trial court did not err in finding that transferring the boys to a different school was for Phyllis's personal reasons.

■ Phyllis alleges that the trial court erred in finding that she changed the boys' school for personal reasons and in not finding that it was the result of a thoughtful parental decision. In the fall of 1998, Phyllis transferred the boys from Glacier Valley to Harborview Elementary School. Through her correspondence with school staff, the custody investigator found that staff and teachers at Glacier Valley had difficulty working with Phyllis. They found her to be in denial about problems the boys were facing and that she avoided dealing with concerns by blaming others.

After visiting the staff and teachers at Glacier Valley, John alleges that Phyllis called to scream at him about turning the teachers against her. Soon after, he contends, Phyllis transferred the boys to Harborview. John also stated in his testimony that the reason Phyllis gave for transferring the children was because he had turned the teachers against Phyllis and, as a result, Glacier Valley was a bad environment for the children. Even though Phyllis's desire to transfer the boys may have been to remove them from an unsatisfactory environment, ample evidence indicates she was the main cause of that unsatisfactory environment.

### 6. The trial court did not err in finding that the boys were aware of the move to Washington in advance.

■ Phyllis states that the trial court's finding that, according to school personnel, the children were aware of the upcoming move to Washington is not supported by the record. In a footnote, Judge Thompson states that the children were "vaguely aware of a move" days before Phyllis quit her job and moved the family to Washington. The custody investigator reports that Harborview's principal indicated that the boys were aware of the move a couple of weeks prior to their departure. Principal Dye stated that Ian let it slip in school but said he wasn't supposed to tell anyone.

Phyllis argues that even though she did not object to this hearsay, it was plain error for the trial court to base a finding on this statement. The argument is unpersuasive. Though she was *pro se* during the hearing, Phyllis objected several times to hearsay during John's examination of witnesses. More importantly, Phyllis admitted in an affidavit that she spoke "to the boys in depth

about moving" and that they "could not wait to leave for Seattle on Saturday."

The trial court's finding that the boys were vaguely aware of the move is supported by both the custody investigator's report and by Phyllis's own testimony. Thus, it was not error, much less plain error, for the court to consider it.

### 7. The trial court did not err in imputing an improper motive for Phyllis's move to Washington.

■ Phyllis attacks the trial court's finding that her move from Juneau was for the purpose of thwarting John's access to the children. She argues that the stress of being a single working mother in a new town, financial pressures, and lack of family support induced her to move back to the Tacoma area.

Judge Thompson's order discusses Phyllis's move by stating that "[t]he final straw on this 'camel's back' was defendant's decision to abscond from Juneau to Tacoma, Washington with the children without any notice whatever to plaintiff. Defendant's testimony that this move was simply a visit which she later determined to become permanent, and/or that it was done on the spur of the moment is frankly incredible." As further proof, Judge Thompson mentioned that within hours of leaving her job, Phyllis had loaded two automobiles on the barge for Washington.

The record supports Judge Thompson's findings that Phyllis had thought of the move in advance and did not inform John of her plans. John affixed that he was not told of the impending move to Washington. He also stated that Ian had told him that their belongings were on the barge south when John first spoke with Ian after his arrival in Washington. In one of her affidavits, Phyllis stated that when she, Francis, and Ian left the Juneau apartment for the final time, just prior to leaving for Washington, the apartment was empty of their belongings. She also stated that when she spoke to John after arriving in Washington, she wasn't sure where in Tacoma she was going to live. Phyllis told the trial court that the day she quit her job she put two cars, loaded with her belongings, on a barge headed for Tacoma.

Despite Phyllis's claims that she was just visiting Tacoma, the fact that she moved everything out of her apartment and shipped it south provided enough evidence for the trial court's finding that she had planned on moving out of Alaska.

### 8. The trial court did not err in finding that John had not received information about the children's school progress because of Phyllis.

■ Phyllis disputes the trial court's finding that John "was forced to pursue inquiries regarding the children's education and health on his own, long distance, with no cooperation. In [Phyllis's] words, 'that was his responsibility'—she had *no* obligation to share these things with him." Phyllis claims this finding is clearly erroneous.

Phyllis's belief that it was not her responsibility to inform John of the children's school progress is clear from her testimony and admitted in her brief. Her objection to this statement appears to be more her impression that the judge found this to be a factor against her claim for custody. She attributes blame to the settlement agreement, claiming that a more specific order as to what was to be provided and by whom would have solved the problem.

While there was nothing mentioned in the custody agreement requiring the custodial parent to share school information, John and Phyllis were to consult with one another on substantial questions relating to educational programs. They were also to exert "their best efforts to work cooperatively in future plans consistent with the best interests of the children...." Having found Phyllis to believe that it was John's responsibility to contact the school for information, the trial court's finding that such a belief did not meet the goals of the child custody agreement is supported by the record.

### B. The Trial Court Did Not Abuse Its Discretion in Awarding Custody to John.

### 1. The trial court did not abuse its discretion in failing to give deference to the original custody order.

■ Phyllis argues that, when considering an action to modify a custody agreement,

a court must give deference to the findings made in the original custody determination. She states that courts should be cautious in modifying custody orders. John argues that the initial custody order is not entitled to deference because there were no factual findings made when the parties settled the custody dispute.

■■■■ A court may not modify child custody or visitation without a substantial change in circumstances.[8] A custodial parent's decision to leave Alaska with the children constitutes a substantial change in circumstances.[9] Such a change justifies a judicial hearing when the parents cannot agree on a mutually-acceptable custody and visitation agreement.[10]

■■■■ In addition to finding a substantial change in circumstances, a court must also consider whether a modification of custody is in the best interests of the child.[11] A court determines the best interests of a child by considering nine statutory factors.[12] A judge considering the best interests of a child must consider the findings made at the original hearing.[13] Here, there were no findings of fact made at the time of the original order as it was entered into pursuant to a settlement agreement. Furthermore, the parties began experiencing problems soon after entering into the stipulated custody agreement,

which had been in effect for less than nine months before Phyllis left the state. Given that a custodial parent's move out of state with the children constitutes a substantial change in circumstances, the trial court did not abuse its discretion in failing to give deference to the original custody order.

■■■ Phyllis also makes a passing reference to the fact that Judge Thompson did not consider any alternative custody arrangements. As this argument was not briefed, it is deemed waived.[14]

### 2. The trial court did not abuse its discretion by placing too much weight on the ability of Phyllis to allow the children an open and loving relationship with John while not placing enough weight on the continuity and stability of the boys' relationship with Phyllis.

■■■ Phyllis argues that the trial court focused narrowly on her adherence to the good faith requirements of the settlement agreement without thoroughly considering all of the best interests factors. Phyllis argues that the trial court solely considered her negative view of John and did not in turn consider John's negative views of her and the impact that would have on the children were he given custody.

8. *Cooper v. State*, 638 P.2d 174, 179 (Alaska 1981).

9. *Moeller –Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001); *House v. House*, 779 P.2d 1204, 1207 (Alaska 1989).

10. *House*, 779 P.2d at 1208.

11. AS 25.20.110(a); *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000).

12. AS 25.24.150(c) provides:
The court shall determine custody in accordance with the best interests of the child under AS 25.20.060–25.20.130. In determining the best interests of the child the court shall consider
(1) the physical, emotional, mental, religious, and social needs of the child;
(2) the capability and desire of each parent to meet these needs;
(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;
(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent;
(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;
(9) other factors that the court considers pertinent.

13. *DeHart v. Layman*, 536 P.2d 789, 792 (Alaska 1975).

14. *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991).

In *Dingeman v. Dingeman*,[15] we upheld a custody award after finding that a father's animosity towards a mother prevented him from fostering an open relationship between the mother and child.[16] Although the superior court had not pointed to specific factual situations that indicated this, we found multiple indications of the father's feelings towards the mother in the record that supported the trial court's conclusion.[17]

In his order, Judge Thompson stated that factor six, "the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent,"[18] was the factor that drove his decision. Judge Thompson looked at Phyllis's lack of cooperation in sharing school information with John, her move to Washington, and her hostility to John for having left their family to indicate that this factor was in John's favor, finding John did not want to pull the children away from Phyllis as much as he wanted to pull the children towards himself.

The trial court also looked at the other statutory factors in making its determination. Judge Thompson found that the first two factors concerning the children's physical, emotional, mental, religious, and social needs favored neither the plaintiff nor the defendant. Given the boys' ages, the trial court stated, their preferences, if known, would be given little weight. Love and affection between parent and children seemed equal in the court's view. Factor seven, domestic violence, abuse, and/or neglect, and factor eight, substance abuse, were not present in this case. The court found no other pertinent matters affecting its decision.

The only factor not explicitly mentioned by the court was AS 25.24.150(c)(5), continuity and stability. However, the trial court did state that it "does not take lightly the decision to shift majority custody from the children[']s lifelong primary parent." This statement indicates that the trial court understood that continuity of care favored custody remaining with Phyllis. The trial court, however, indicated that the children were not living in a stable environment. The trial court found that the boys were beginning to exhibit the effects of the stress being placed on them by Phyllis's inability to encourage John's parenting. Furthermore, the children's lives with Phyllis were not necessarily stable. After the parties separated, Phyllis and the boys lived in three different towns, Petersburg, Juneau, and Tacoma.

Alaska Statute 25.24.150(c)(5) requires the court to look to the desirability of maintaining continuity. While Judge Thompson found Phyllis to be a good parent, he also indicated that her inability to cooperate with John required custody to be placed with John. John, he found, only wanted to "pull the children *toward* himself rather than *away from* [Phyllis]." (Emphasis in original.)

Judge Thompson found Phyllis's inability to allow John frequent access to the children, and the stress that this was causing the boys, to be more important than the desirability of maintaining continuity of care by Phyllis. This decision is supported by the recommendation of the custody investigator who indicated that custody should be changed immediately, despite the disruption to their education that it would have caused had it been done when the investigation report was first published in late March.

### 3. The trial court did not abuse its discretion in its weighing of the children's religious needs.

Phyllis has raised the boys as Jehovah's Witnesses since 1995. John has expressed a great deal of hostility towards this religion and the effect it is having on the boys. He has expressed a desire to allow the boys to make up their own minds as to religion when they are old enough to fully understand it. Despite his past hostility towards Phyllis's choice of religious beliefs, John stated during his testimony that he would not stand in the children's way if they choose to practice Phyllis's religion. He ex-

**15.** 865 P.2d 94 (Alaska 1993).

**16.** *Id.* at 98.

**17.** *Id.*

**18.** AS 25.24.150(c)(6).

pressed a tolerance for the children's reading, study, and discussion of the religion with people who are knowledgeable and interested in it.

Phyllis claims that the trial court did not account for John's intolerance toward the boys' religious beliefs as Jehovah's Witnesses. She claims that placing the children, especially Francis who has begun to internalize a religious belief system, into a home where such beliefs are not respected is a factor the trial court should have given more consideration.

 Although a court may not rely on the religious affiliations of the parties in making a best interests determination, the religious needs of a child are a factor the court can consider.[19] The court must make a finding that the child has actual religious needs and that one parent can better satisfy those needs.[20] In deciding actual religious needs, we determine whether a child is "mature enough to make a choice between a form of religion or the lack of it." [21] In *Bonjour v. Bonjour*, while noting that the maturity of a minor will vary from case to case, we commented favorably on one court's holding that "children aged three, five, and seven are not of sufficient maturity to form an intelligent opinion on so complex a subject as religion or their needs with respect to it." [22] In that case we went on to consider the kinds of determinations a trial court may need to make when a fifteen-year old child has developed either strong religious or anti-religious beliefs.[23] As Francis and Ian are nine and seven, respectively, they are not yet mature enough to make a choice between a form of religion or the lack of it.

In spite of John's admitted instances of previous intolerance, Judge Thompson found his tolerance expressed at trial to be believable. As such, the court found that the religious aspects of the first two factors in determining the best interests of the children favored neither John nor Phyllis. Because the children lacked the maturity needed to present an actual religious belief, the trial court was not required to give further consideration to the boys' religious needs beyond its belief in John's tolerance. Furthermore, the trial court expressly stated in the order that should John's tolerance wane and should he begin to "affirmatively attempt to ridicule or undermine [Phyllis's] religious beliefs to the children, this factor could become more important."

### 4. The trial court did not abuse its discretion in not addressing the cultural needs of the children.

 Phyllis argues that the trial court failed to consider the fact that the children are bi-racial as a pertinent factor under AS 25.24.150(c)(9). She argues that the trial court failed to consider whether the children's specific cultural needs can best be met in Petersburg or Tacoma. Rather than addressing the problems these boys may face as bi-racial children, Phyllis claims that the trial court merely favored the local party.

 John argues that we should not consider the trial court's lack of findings regarding Francis and Ian's cultural needs because Phyllis did not raise those needs at trial. He points to case law indicating that matters that are not brought before the trial court will not be considered on appeal.[24] The court, however, holds *pro se* litigants to a less stringent standard than lawyers.[25] As such, if Phyllis in any way flagged the issue as one of concern for the trial court to consider, her failure to make an explicit claim should not be held against her. We find that Phyllis met this minimal burden.[26]

---

19. *Bonjour v. Bonjour*, 592 P.2d 1233, 1238–39 (Alaska 1979).

20. *Id.* at 1239.

21. *Id.* at 1240.

22. *Id.* at 1240 n. 14.

23. *Id.* at 1240.

24. *See B.B. v. D.D.*, 18 P.3d 1210, 1214 (Alaska 2001).

25. *Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987).

26. In her direct and cross examinations, Phyllis did bring up race a number of times. She asked about John's family members' relationships with people of color. During the trial, John also brought up race, possibly attempting to paint Phyllis as biased against white people. (Judge

Because John, who lives in Petersburg, was given custody of the children, Phyllis, who lives in Tacoma, argues that the trial court failed to address the children's cultural needs. She claims that in Tacoma the children will be exposed to the African American culture through their schooling and her family more than they would living in Petersburg.

Phyllis claims that under *Rooney v. Rooney*,[27] a trial court must consider a child's cultural needs in the overall context of a best interests determination. In *Rooney*, the mother in the custody dispute was Tlingit, living in Sitka, while the father was white, living in Wrangell. The guardian ad litem recommended that because the child was of a mixed racial background, he needed to be exposed to both cultures.[28] Despite the absence of a strong native presence and native elders in Wrangell, especially when compared with the exposure the child would get to the Tlingit culture living with his mother in Sitka, the superior court awarded custody to the father.[29] In affirming the custody award, we stated that cultural needs are not determinative and that the mother would have adequate opportunity to expose her child to her culture during her extensive visitation periods (the three month summer vacation and various other school vacations) and through her family that remained in Wrangell.[30]

Here, the trial court made no mention of the boys' cultural needs in its order, probably because the parties did not argue that cultural needs were at issue. No mention was made by Phyllis of the boys' status as biracial children in the custody investigation report. The only mention by John occurs when he speaks of difficulties the children may have fitting in at school due to their mixed racial heritage, indicating his awareness and concern for the problems the children may face. There is also no evidence in the record as to the relative racial and ethnic makeups of Petersburg and Tacoma.

We perceive no error pertaining to the children's cultural needs. As noted, the trial court did not explicitly consider the cultural needs of the boys because there was no evidence presented to the trial court upon which such a determination could be made. And Phyllis will have custody of the boys during the three month summer vacation as well as other various school vacations, just like the mother in *Rooney*. The trial court knew that John was aware of the possible problem. Finally, the boys were being placed into a multiracial home.[31] All of these circumstances lead us to conclude that the trial court did not abuse its discretion in not explicitly addressing the children's cultural needs.

## V. CONCLUSION

Because the trial court did not make any clearly erroneous factual findings nor did it abuse its discretion in awarding custody to John, we AFFIRM the trial court's decision.

---

Thompson, however, stated that any such implications are unsupported and any overreaction Phyllis may have had toward those accusations is understandable.)

**27.** 914 P.2d 212 (Alaska 1996).

**28.** *Id.* at 214.

**29.** *Id.* at 218.

**30.** *Id.*

**31.** John's girlfriend, Jennifer Valentine, is Vietnamese and has a son, James, whose ethnicity and race do not appear in the record. As the children will be living in a home with John, Jennifer, and James, they will be exposed to a variety of cultures and races. Rather than not seeing anyone who looks like them, as Phyllis fears, they will see a home where no one looks the same as anyone else.