NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JULIE JUNG SCOTT, | ) | |
| | ) | Supreme Court No. S-16093 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-05809 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| DORIEN TYRYAL GAINES, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1636 – June 14, 2017 |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Vikram N. Chaobal, Law Office of Vikram N. Chaobal, Anchorage, for Appellant. J. E. Wiederholt, Aglietti, Offret & Woofter, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I. INTRODUCTION

A couple married in Alaska in August 2012, after which they moved to Texas where their child was born while the father was out of state for military training. The father visited the mother and the child for Christmas week in 2012, and in January 2013 the mother took the child to Alaska, where she decided to stay and file for divorce. The divorce was granted in August 2013 and the mother was awarded primary custody, with the father being awarded liberal visitation rights. The father was subsequently

_____

\* Entered under Alaska Appellate Rule 214.

deployed, and in March 2014 he received limited leave and traveled to Alaska for his two weeks of overnight visitation with the child. The mother, who had received notice of his planned visit in January, attempted to frustrate visitation by failing to answer her phone and by filing a domestic violence petition that was determined to be "bogus," unsupported by any evidence, and intended solely to prevent visitation. The father filed an emergency motion with the superior court in order to enforce his visitation, and the court strongly admonished the mother for her actions and ordered a detailed visitation schedule for the remainder of the father's limited leave. In June 2014 the father filed a motion to modify custody, and in July 2015 the court issued an oral decision and a written order, setting forth detailed findings regarding the substantial change in circumstances and the nine best interests factors and awarding primary physical custody to the father and liberal visitation to the mother. The court also awarded the father a portion of his attorney's fees. The mother appeals. We affirm.

## II.     FACTS AND PROCEEDINGS

Julie Scott and Dorien Gaines married in August 2012. Initially they lived in Anchorage, and it appears that a couple of months after getting married they moved to the Fort Hood, Texas area, where their child, B.G.,[1] was born in November 2012. Gaines was sent to Oklahoma for military training sometime that fall and met their child for the first time during his one-week leave over Christmas 2012. In January 2013 Scott took their child to visit her parents in Anchorage, where she decided to stay instead of returning to Texas. Around February 13 Scott and Gaines permanently separated when Scott informed Gaines that she was seeking a divorce. Scott filed for divorce in Anchorage in March 2013.

---

[1]      We use initials to protect the child's privacy.

## A.    Initial Custody And Visitation Order

The divorce trial was held in August 2013. The parties represented themselves, Scott being physically present and Gaines participating telephonically from Texas. On August 19 the superior court granted the divorce and issued findings of fact and conclusions of law. The court awarded Scott and Gaines shared legal custody of their child. There was "no practical way to have shared physical custody" due to the child's age, the fact that the parents resided in different states, and the parents' financial situations, so the court awarded primary physical custody to Scott and "liberal visitation rights" to Gaines. The court awarded Gaines "liberal phone and Skype privileges" for visitation with the child and ordered Scott to "take reasonable steps to accomplish this ongoing communication." The court also awarded Gaines a minimum of two weeks of consecutive overnight visitation in Alaska every year until the child entered school; Gaines was to provide Scott with notice at least 30 days before these visits, and the parties were to evenly split the cost of Gaines's airfare.

## B.    2013 Best Interests Findings

The August 2013 divorce decree and custody order included detailed analysis of the superior court's findings under the nine best interests factors in AS 25.24.150(c). The court found that the child was a normal infant with no reported special needs, and that both Scott and Gaines, who were only 18 years old at the time of their divorce, had to learn how to parent. The first two best interests factors[2] favored Scott based on her capability and desire to meet the child's needs. The court indicated that Scott prevailed under the first factor only because "Scott ha[d] been caring for the child 24/7, in part because she moved from Texas with the child and in part because she

---

[2]    AS 25.24.150(c)(1) ("the physical, emotional, mental, religious, and social needs of the child"); AS 25.24.150(c)(2) ("the capability and desire of each parent to meet these needs").

d[id] not work," and "not because Gaines is 'incapable' in this respect." The court found that both parents had the desire to care for the child but noted that Gaines's "change to thinking like a father . . . [was] still evolving due to his age and geographical separation."

Neither parent prevailed with respect to the third and fourth best interests factors.[3] The child was less than one year old and thus too young to have a preference under the third factor. As to the fourth factor, the court found that both parents had love and affection for the child. The court acknowledged that because the child "ha[d] been exposed almost exclusively to Scott," the child "ha[d] a bond with Scott only"; however, the court pointed out that this was because of Scott's move to Alaska and because Gaines did not have sufficient financial resources for frequent visits to Alaska. It indicated that "a child should have the ability to develop love and affection with both parents."

The court found that the fifth factor[4] favored Scott at the time because no evidence showed her environment to be unstable or unsatisfactory and because Gaines had an upcoming one-year deployment. The court noted that "this may change in the future depending on Gaines'[s] future living situation."

Gaines prevailed as to the sixth factor,[5] with the superior court finding him

---

[3]    AS 25.24.150(c)(3) ("the child's preference if the child is of sufficient age and capacity to form a preference"); AS 25.24.150(c)(4) ("the love and affection existing between the child and each parent").

[4]    AS 25.24.150(c)(5) ("the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity").

[5]    AS 25.24.150(c)(6) ("the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child").

"very willing to facilitate and encourage a close and continuing relationship [between] the child and Scott." The court acknowledged that both parents were "very young and ha[d] a lot of maturing to do," but it was impressed by Gaines's "insightfulness and . . . willingness to learn to be a father and to involve Scott in the process of mutually raising [B.G.]," whereas it found that Scott "believe[d] that only she [could] care for the child" and that "she appear[ed] to have taken a few steps . . . toward excluding Gaines from the relationship."

Neither parent prevailed as to the seventh or eighth factor.[6] Under the seventh factor "[t]here was some testimony of domestic violence" but nothing "ris[ing] to the level of domestic violence contemplated by the statutes." The court cited testimony regarding two specific incidents. The first incident was one time when Gaines pushed Scott; Scott "testified that she was an equal part of that dispute . . . [and] was not injured," and Gaines testified that he pushed her "only to stop her from hitting him." The second incident was during Christmas 2012 when "Gaines raised his voice once around the child"; Gaines testified that "it was because he was a new and young parent who was just back from . . . out-of-state military training and seeing his child for the first time, that he did not even know how to hold the newborn, and that despite his request for help Scott refused to give advice." The eighth factor was inapplicable because there was no evidence of substance abuse.

Under the ninth factor,[7] the court considered pertinent the fact that Gaines

---

[6] AS 25.24.150(c)(7) ("any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents"); AS 25.24.150(c)(8) ("evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child").

[7] AS 25.24.150(c)(9) ("other factors that the court considers pertinent").

"want[ed] to get to know and care for his child." However, it indicated that Gaines himself "acknowledged that his military position and upcoming yearlong deployment w[ould] present a challenge as to child custody." The court found that Gaines's testimony focused largely on the fact that if he had the child seven months a year, he would "qualify for a higher housing allowance and thus be able to provide more for the child," but it pointed out that "although finances are certainly a large consideration, that is not the same as being able to provide the 24/7 care an infant needs."

### C. Attempted Visitation And "Bogus" Domestic Violence Petition

In January 2014 Gaines provided Scott with notice of his intent to exercise visitation during his leave from military service in March. The notice was provided through his mother, who texted Scott to inform her that Gaines would "be arriving in Alaska to see [B.G.] around the first or second week of March." Text messages from Scott show that she received the notice.

Gaines's leave was limited, so he traveled directly to Anchorage from his deployment in Kuwait, but when he arrived on March 3 he was initially prevented from exercising his visitation. He testified that Scott would not answer her phone, even though he called her immediately upon his arrival in Anchorage and repeatedly called her after that. He also placed written notices on Scott's door and on two vehicles parked at the residence. Gaines testified that he contacted the police, who told him that they could not help him obtain visitation because it was a civil matter; one of the officers nevertheless called Scott several times on Gaines's behalf, but Scott still did not answer her phone.

On March 6 Gaines filed an emergency motion to compel visitation. In his affidavit he stated that he had been deployed to Kuwait since September 15, 2013, and that he had not seen the child since December 2012 (the first and only time he had met his child). He alleged that since that time Scott had "refused [him] _all_ meaningful

communication and contact with [his] son" and "active[ly] interfere[d] with [his] visitation" in violation of the August 2013 court order. He alleged that Scott's interference with visitation constituted a material change in circumstances and indicated that he wanted to preserve his right to seek modification of child custody when he returned to the United States. Gaines explained that he was scheduled to redeploy to Kuwait on March 19 and was unlikely to have the opportunity to return to the United States until September, and he requested a writ of assistance to allow him visitation during the remainder of his limited leave in Anchorage.

On March 5, the day before Gaines filed his emergency motion, Scott filed a domestic violence petition and was issued a 20-day ex parte protective order against Gaines, and on March 11 the superior court held an emergency hearing to address both Gaines's emergency motion and Scott's domestic violence petition.[8] Because Scott's domestic violence petition "attempted either to raise domestic violence allegations from whole cloth or to resurrect such issues from prior proceedings" that the court had previously addressed and "disposed of . . . as without merit," the court found that "[t]he factual and legal grounds for [Scott's] . . . domestic violence petition [were] without any merit whatsoever." The court characterized Scott's domestic violence petition as "bogus" because the issues raised had already been dealt with and because Scott was using the petition to try to keep Gaines from having visitation with their child; it found that there was no evidence supporting the petition. The court regarded the domestic violence petition "as further and unfortunate evidence of [Scott's] obvious and unwarranted attempts to interfere with and prevent [Gaines's] visitation."

On the record the court ordered a visitation schedule for Gaines to see the

---

[8] Superior Court Judge Patrick J. McKay stood in for Judge Gregory Miller for the March 2014 hearing.

child during his remaining time in Anchorage. The court also ordered Scott to facilitate weekly visitation via phone or video communication after Gaines's return to Kuwait. The court strongly admonished Scott for her baseless interference with Gaines's visitation rights and warned her that she could be fined for such violations. The court's findings and orders regarding visitation were memorialized in a detailed written order issued the same day as the emergency hearing.

### D. Modification Of Custody And Visitation

In June 2014 Gaines filed a motion to modify custody and visitation and requested that the superior court appoint a child custody investigator. He alleged a substantial change in circumstances based on Scott's intentional interference with his visitation and sought primary legal and physical custody of the child, with his parents "as designated care providers" during any temporary absence. Scott opposed his motion, arguing that AS 25.20.095(c) did not permit Gaines to delegate primary custody or visitation rights to his parents during deployment and that the requested modifications were not in the child's best interests. The court granted Gaines's motion for a custody investigation. The custody investigation was completed and the report submitted on December 31, 2014; among the materials reviewed by the court-appointed custody investigator was a report from a guardian ad litem (GAL) hired by Gaines to do a home study in Texas.[9] The court held an evidentiary hearing on May 11 and July 20-21, 2015. The court also accepted supplemental briefing filed by both parties on July 24.

On July 27 the superior court issued an oral decision setting forth its

---

[9] In its later July 27, 2015 oral decision the superior court referred to this contract GAL sometimes as a custody investigator and sometimes as a GAL, and it referred to her report as a custody investigator's report. In this memorandum decision and judgment we likewise refer to this GAL as a custody investigator, in accordance with the superior court's wording.

findings of fact and conclusions of law, and issued a written order incorporating that oral decision and setting forth the terms of custody and visitation. The court found that there had been a substantial change in circumstances and that modification of custody was in the best interests of the child. The court denied Gaines's request for sole legal custody but granted Gaines's request for primary physical custody and awarded Scott liberal unsupervised visitation rights and liberal ongoing communication via phone and Skype or their equivalent.

In its oral decision the court applied the two-step analysis required by AS 25.20.110(a): "An award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child." The court cited to *Hamilton v. Hamilton* for the proposition that there must be a substantial change in circumstances and indicated that this court has held that the inability to communicate or continued lack of cooperation between the parents could constitute a substantial change in circumstances sufficient for a modification of custody under the statute.[10] And the court cited to the statute and *Hamilton* for the need to consider the nine best interests factors, including "the [best interests] findings made at the original hearing," in order to determine whether modification is in the best interests of the child.[11] The court found that Gaines had established a substantial change in circumstances warranting modification of custody. The court also considered the best interests factors, taking into

---

[10] *Hamilton v. Hamilton*, 42 P.3d 1107, 1115 (Alaska 2002). The superior court also cited three other cases in support of the proposition that the inability to communicate or continued lack of cooperation between the parents could constitute a substantial change in circumstances. *Azzam v. Mortenson*, Nos. S-15441, S-15451, 2015 WL 853065, *3 (Alaska Feb. 25, 2015); *Peterson v. Swarthout*, 214 P.3d 332, 341 (Alaska 2009); *T.M.C. v. S.A.C.*, 858 P.2d 315, 319 (Alaska 1993).

[11] *Hamilton*, 42 P.3d at 1115; *see* AS 25.20.110(a).

account both its current findings and the findings in the original order. The court found that it was in the best interests of the child to modify custody by awarding Gaines primary physical custody and awarding Scott liberal overnight, unsupervised visitation.

## E. Substantial Change In Circumstances

The court found that Gaines had met his burden of showing a substantial change in circumstances and enumerated thirteen facts leading to that conclusion. First, Gaines was no longer deployed and Scott was no longer unemployed. Second, in March 2014 Scott "actively and repeatedly took steps to impede Mr. Gaines's visit with [B.G.]," including filing a "bogus" domestic violence petition. Third, "even following [the] court's August 19 order that said 'unsupervised' and even following Judge McKay's March 11, 2014 order and very strong admonishments, Ms. Scott unilaterally imposed a supervisor requirement" by using a friend to supervise Gaines's visitation.

Fourth, the court found Scott had done other things constituting a substantial change in circumstances, including withholding information about the child's healthcare despite Gaines's request for such information. Fifth, Scott failed to disclose the child's need for dental work. Sixth, despite Gaines's requests, Scott refused to tell him where she worked or what her schedule was, which made it difficult to schedule Skype visitation (and scheduling had been an issue). Seventh, despite Gaines's requests, Scott refused to disclose what daycare services she used for the child.

The superior court recognized that the evidence in factors eight, nine, and ten was disputed but found that Gaines's mother and the Texas custody investigator were credible whereas Scott was not credible and noted that "this [was] not a close call."[12]

---

[12] In fact, the court found that "issue after issue, question after question, Ms. Scott and her father . . . were not credible, and it was Ms. Scott's father, Wayne Scott, who urged Ms. Scott to file the DV petition in March 2014 that Judge McKay found to be bogus and intended to interfere with visitation."

The eighth fact was that in April 2014 Scott refused to speak with a Texas custody investigator who had properly identified herself. Ninth, in 2014 and 2015 Scott posted messages on social media "that [made] it very apparent that she ha[d] no desire to have Mr. Gaines in the picture of raising [B.G.]" despite her in-court testimony to the contrary. Tenth, in June and July 2015 Scott ignored requests by Gaines's mother to be added as a contact for purposes of Skyping with B.G.

The eleventh fact focused on testimony by Scott's mother, who indicated that she "somewhat object[ed] to Mr. Gaines having visitation," that she "[didn't] think that [B.G.] need[ed] more Skype with Mr. Gaines than once per week," that it was "not up to Ms. Scott to try to improve the visits," and that she perceived Gaines's note on her windshield seeking visitation in March 2014 as a "threat."

The twelfth fact related to Scott's argument that Scott was "immature when she filed the DV petition last year but that she has matured greatly and has learned from Judge McKay's strong words." The superior court found that she had "matured somewhat," but the court indicated that "it [was] not her immaturity that cause[d] th[e] court to find a material change in circumstances. Rather, it [was] her — and her parents' — obvious, exceptionally strong dislike, you might even call [it] hatred, of Mr. Gaines, and all three of them taking active and/or passive steps to limit Mr. Gaines's visitations and time with [B.G.], this despite their words to the contrary." The court also cited language from Gaines's post-trial memorandum, and it agreed with and adopted the following statement: "The practical limitations under which this court labored in 2013 no longer counsel for [Scott's] primary custody. Indeed, the facts today proclaim against that disposition in spades. The considerations which forced the court's reluctant acceptance of [Scott] as primary custodian [in 2013] no longer exist." The thirteenth and final fact enumerated by the court in support of its determination that there had been a substantial change in circumstances warranting modification of custody was that Scott

herself acknowledged that custody should be modified.

F.    **2015 Best Interests Findings, Including Consideration Of 2013 Findings**

The superior court considered the nine statutory best interest factors both as they existed at the time of the custody modification proceeding and as the court had found them in its 2013 order.  The court indicated that the first two factors — "the physical, emotional, mental, religious, and social needs of the child" and "the capability and desire of each parent to meet these needs"[13] — are closely linked and that it previously found that these factors "slightly favored" Scott because Gaines was going to be deployed whereas Scott was unemployed and therefore able to care for the child full time.  Gaines had since returned to Texas, and the court found that he had "no future deployment on the horizon" although it recognized that deployment was a possibility.  And Scott now worked full time, as did Gaines.  The court considered Gaines's and Scott's daycare and living situations, including the fact that both would use the grandparents for daycare and that Scott's father had multiple disabilities whereas Gaines's parents were in good health and Gaines's mother was or had been a certified daycare provider; it also noted that Gaines had a family care plan in place.  The court found that Scott had been "doing a fine job" providing for the child's needs and that Gaines was also able to do a fine job.  Therefore, the court concluded that "neither parent [was] favored as to these first two factors" and emphasized that "this is a change from [the] August 19, 2013 order."

The court found that the third factor, "the child's preference if the child is of sufficient age and capacity to form a preference,"[14] was not applicable because the

---

[13]    AS 25.24.150(c)(1)-(2).

[14]    AS 25.24.150(c)(3).

child was only two years old.

Neither parent prevailed under the fourth factor, "the love and affection existing between the child and each parent,"[15] because of the court's finding that "both parents have great love for [B.G.], and the evidence is that he loves them both back equally."

Next the court addressed the fifth factor, "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity,"[16] indicating that it had previously found that that factor slightly favored Scott because of Gaines's deployment but that "this may change in the future depending on Gaines'[s] future living situation." The court recognized that the child had lived exclusively with Scott and that it appeared that Scott was a good mother and had provided a stable, satisfactory home. However, the court pointed out that the fifth factor also required consideration of "the desirability of maintaining continuity."[17] The court found that "Gaines [was] trying to build his relationship with [B.G.] rather than . . . pull [him] away from Ms. Scott."[18] In contrast, Scott was preventing the child from developing a relationship with Gaines and thus from having both parents actively involved in his life, which we have held can "be more important than the desirability of maintaining continuity of care."[19] The superior court recognized that "moving a child from one setting to another should certainly not be done lightly" and that "children need continuity" but indicated that Scott's "animosity" against Gaines and Scott's desire to

---

[15]     AS 25.24.150(c)(4).

[16]     AS 25.24.150(c)(5).

[17]     *Hamilton v. Hamilton*, 42 P.3d 1107, 1116 (Alaska 2002).

[18]     *See id.*

[19]     *Id.*

not have Gaines in the picture of raising the child "create[d] an unsatisfactory environment and that it [was] undesirable to maintain that aspect, that continuity." The court found that Gaines could provide a stable, satisfactory environment, even if he were to be redeployed; it indicated that under AS 25.20.095 it could not hold a possible redeployment against Gaines, when he had an approved family care plan in place.[20] The court found, based on the totality of the evidence, that neither parent prevailed under the fifth factor.

In addressing the sixth factor, "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child,"[21] the court indicated that it was impressed with both the words and the actions of Gaines and his parents and found them to be "very, very credible." It further found that Gaines and his parents would "move forward in a positive way to facilitate and encourage a close and continuing relationship between [B.G.] and Ms. Scott."

The court indicated that it could not say the same of Scott and her parents

---

[20] Scott argues on appeal that the superior court was not barred from considering Gaines's deployments. She cites *Rosenblum v. Perales*, in which we held that while AS 25.20.095(a) bars consideration of temporary deployment, "the superior court was not statutorily barred from considering [the father's] deployments in its assessment of the child's best interests" where the deployments were not "temporary" but rather were "regular deployments of up to four months of every year." 303 P.3d 500, 505-06 (Alaska 2013). Scott then argues that "[i]t was profound error for the superior court to not address the issue of [Gaines's] regular deployments," which she describes as "3 months out of every 12." However, the court found in its July 27, 2015 decision that Gaines had "no future deployment on the horizon," although it recognized that future deployment was possible in light of the fact that Gaines was in the military. Thus, the court's findings did not show anything akin to the "regular deployments" in *Rosenblum* but rather, at most, the type of temporary deployment that AS 25.20.095 bars consideration of. The superior court did not err in not considering the possibility of Gaines being deployed at some point in the future.

[21] AS 25.24.150(c)(6).

and that what it had "feared" in the previous order had "unfortunately come to fruition." The court pointed to Scott's and her parents' evasiveness and "verbal[] fighting" during cross-examination; "Scott and her father were evasive and not credible, and [her] mother was just a little bit better." Notably, Scott "testif[ied] a couple times that she has no idea how she could possibly do more to facilitate the relationship between [B.G.] and Mr. Gaines. . . . She said that even as she, her parents, and her attorney all . . . were acknowledging that Ms. Scott had made huge errors . . . in trying to stop Mr. Gaines's March 2014 visits." Despite Scott's claim to the contrary, the court found that Scott had not "done . . . everything satisfactorily since then." The court indicated that Scott had perjured herself in her "bogus" domestic violence petition[22] and that she again perjured herself multiple times in court in 2015, directly misrepresenting various facts.[23] And the

---

[22] The court also found that Scott's claim in her June 2014 affidavit that she was not trying to "limit or thwart . . . visitation" was "wholly incredible and dishonest" and that that was "exactly what [Scott] was trying to do."

[23] The court made clear that it was "[not] just about the . . . March 2014 events" but "[r]ather Ms. Scott's untruthfulness continued throughout her testimony, including just this past week [preceding the July 2015 oral decision]." The court emphasized that only one week earlier, on July 20, 2015, Scott "testified untruthfully . . . about not getting the calls or email from the Texas GAL in April 2014." The court pointed out that "beyond just her demeanor, her body language, her lack of truthfulness as to *so* many other questions and answers," this untruthful in-court testimony, under oath, was contradicted by page 8 of Scott's June 24, 2014 Opposition to Motion to Modify Custody and Visitation, in which Scott admitted to "refus[ing] to talk to and cooperate with [Gaines's] hired custody consultant in Texas" and claimed that "she had no obligation to do so, and cannot be faulted for not wishing to participate" and by "her other testimony at trial, [in which] she somewhat acknowledged that indeed she *got* those calls but that she just chose not to return them, and the email." Other examples identified by the court include findings that Scott testified in "an untruthful manner about [her] Facebook posts," which the court found were clearly about Gaines and about Scott's "not wanting him in [B.G.'s] life," and that Scott testified in an untruthful manner
(continued...)

court found that her continuing untruthfulness was "for a single purpose: to not facilitate and encourage visitation."

The court found that Scott and her parents had "tremendous animosity towards Mr. Gaines" for his not visiting the child and that they did "not seem at all inclined to [taking] any steps towards getting past that or the ability to get past it," and yet "it was Ms. Scott that took [B.G.] from Mr. Gaines in January 2013 . . . and moved to Alaska" and "it was Ms. Scott who thereafter filed a DV to prohibit Mr. Gaines from the contact with [B.G.] he was seeking." Scott also withheld information requested for visitation and limited what visitation did occur. The court summed up its analysis of factor six as follows:

> Ms. Scott is not credible as to her testimony on this issue and thus I find that she really has no desire to facilitate the relationship. I find that she'll facilitate that relationship . . . only if she is under very close judicial scrutiny, but that is not what the law contemplates. So whereas in my August 19, 2013 order I held that Mr. Gaines prevailed as to this factor, number six, I now hold that he strongly, strongly prevails[,] . . . that he very strongly prevails. I have no hesitation in predicting that if I don't change custody, that we'll be right back here, that Ms. Scott won't change her ways, at least not sufficiently. I also have no hesitation in predicting that Mr. Gaines will do just fine in raising [B.G.] and communicating with, facilitating and encouraging the relationship between [B.G.] and Ms. Scott.

Neither parent prevailed under the seventh or eighth factor because there was no evidence of "domestic violence, child abuse, or child neglect" and no evidence of "substance abuse by either parent or other members of the household [that] directly

---

**23** (...continued)
to never receiving the text from Gaines's mother in June or July 2015, in which Gaines's mother asked to be added as a contact, so she could Skype B.G.

affects the emotional or physical well-being of the child."[24]

For the ninth factor, "other factors that the court considers pertinent,"[25] the court found that Scott failed to follow the provision in Judge McKay's March 2014 order requiring Scott "to cease and desist from any conduct which, either passively or actively, prevents, interferes[] with[,] or unnecessarily limits the greatest possible contact between the child and [Gaines]." The court noted that Scott's references provided no written responses for the court-ordered child custody investigation and that Scott did not testify credibly when she claimed not to remember the names of the people she asked for written responses. The court cited the recommendation in the court-ordered custody investigation report that "[i]f Mother interferes with Father's ordered visitation again[,] then strong consideration should be given to assigning primary physical custody to Father," and it found that such interference had occurred.[26] The court also cited Scott's assertion in her June 2014 affidavit — that "[n]ow that the importance of doing so [i.e., fostering the visitation] has been emphasized, I fully support facilitating a good relationship between my son and his father AND father's family, by sticking to the court visitation schedule, and by being flexible and cooperative whenever necessary to achieve good results" — and found that Scott was "not capable of doing that," that her statement was not credible, and that she was "anything but flexible and cooperative."

Based on its analysis of these nine best interests factors, and having "considered all the evidence, including the two custody investigators' reports," the superior court found that it was in the child's best interests for Gaines to have primary

---

[24]    AS 25.24.150(c)(7)-(8).

[25]    AS 25.24.150(c)(9).

[26]    The court mistakenly identified the report as being by the Texas custody investigator, but it quoted from the court-ordered custody investigation report.

physical custody and for Scott to have liberal overnight unsupervised visitation. The court emphasized that it did "not take lightly the decision to shift majority custody from the [child's] lifelong primary parent."[27] As to legal custody, the court found that joint legal custody was appropriate because the court "ha[d] every reason to believe" that Gaines, as B.G.'s primary custodian, would appropriately share information with Scott.

### G. Attorney's Fees, Motion For Reconsideration, And Appeal

Both parties filed motions for attorney's fees. Gaines sought $6,296 out of his actual fees of $20,988; he also sought $10,816 in travel costs. Scott sought $7,500. The superior court explained that pursuant to AS 25.20.115, the relative financial situation of the parties and the parties' good faith (or lack thereof) were the key considerations for its award of attorney's fees. The court found that Gaines had "a good job, good benefits, and a good future" whereas Scott earned very little. The court then referenced its extensive findings about Scott repeatedly acting in bad faith whereas Gaines at all times acted in good faith. Declaring that "Scott ought to pay more but can't afford it," the court granted Gaines's request for attorney's fees and costs in the amount of $4,500, and it denied Scott's cross-motion for fees. In support of its decision not to award Gaines his full fee request, the court pointed out that Scott had already been sanctioned $1,575 for her baseless domestic violence petition and that Gaines's witnesses arguably could have elected to appear telephonically, rather than traveling from Texas to Alaska.

The superior court subsequently denied Scott's motion for reconsideration. Scott appeals, challenging the superior court's best interests findings and child custody modification, as well as the award of attorney's fees.

---

[27] *Hamilton v. Hamilton*, 42 P.3d 1107, 1116 (Alaska 2002).

## III. STANDARD OF REVIEW

The superior court has "broad discretion in deciding child custody disputes"[28] and in determining whether a proposed modification of child custody is in the best interests of the child.[29] We will overturn "the superior court's best interests determination only if [it] abused its discretion or if the fact findings on which the determination is based are clearly erroneous."[30] Particular deference is afforded "to factual findings based primarily on oral testimony."[31] A determination that there has been a substantial change in circumstances sufficient to modify child custody is reviewed for abuse of discretion.[32]

"An abuse of discretion has occurred if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[33] "A finding of fact is clearly erroneous only when a review of the entire record leaves us with a definite and firm conviction that the trial court has made a mistake."[34] We review

---

[28] *Stephanie W. v. Maxwell V.*, 274 P.3d 1185, 1189 (Alaska 2012) (quoting *Melendrez v. Melendrez*, 143 P.3d 957, 959 (Alaska 2006)).

[29] *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011) (citing *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005)).

[30] *Id.* (citing *Ebertz*, 113 P.3d at 646).

[31] *Kristina B. v. Edward B.*, 329 P.3d 202, 207 (Alaska 2014).

[32] *Hunter v. Conwell*, 276 P.3d 413, 418 (Alaska 2012) (citing *McLane v. Paul*, 189 P.3d 1039, 1042 (Alaska 2008)).

[33] *Stephanie W.*, 274 P.3d at 1189 (quoting *Evans v. Evans*, 869 P.2d 478, 479-80 (Alaska 1994)).

[34] *Id.* (quoting *Evans*, 869 P.2d at 479); *Rego*, 259 P.3d at 452.

de novo whether the superior court applied the correct legal standard.[35]

Awards of attorney's fees are reviewed for abuse of discretion,[36] and the question of "whether an award of attorney's fees is governed by a rule or an exception to a rule" is reviewed de novo.[37]

## IV.   DISCUSSION

### A.   The Superior Court Did Not Err In Its Best Interests Findings And Did Not Abuse Its Discretion In Finding A Substantial Change In Circumstances And Modifying Custody.

Under AS 25.20.110(a), the superior court may modify a child custody award "if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child." To modify custody, this court has required a substantial change in circumstances.[38]

The superior court did not abuse its discretion in determining that there had been a substantial change in circumstances warranting modification of child custody. Scott argues that the change in custody was based on "minor infractions," namely, a social media post, an allegedly supervised visitation, and Scott's domestic violence petition. But the superior court characterized Scott's domestic violence petition as "bogus" and unsupported by any evidence; the court found the petition was filed for the sole purpose of preventing visitation. These findings are supported by the record and cannot be viewed as merely "minor infractions." Scott's argument also fails to recognize

---

[35]     *Rego*, 259 P.3d at 452.

[36]     *Rosenblum v. Perales*, 303 P.3d 500, 503 (Alaska 2013) (citing *Moody-Herrera v. State, Dep't of Nat. Res.*, 967 P.2d 79, 82 (Alaska 1998)).

[37]     *Id.* (citing *B.J. v. J.D.*, 950 P.2d 113, 118 (Alaska 1997)).

[38]     *See Hunter v. Conwell*, 276 P.3d 413, 418 (Alaska 2012) (citing *McLane v. Paul*, 189 P.3d 1039, 1042 (Alaska 2008)).

that the court made detailed findings, enumerating thirteen facts leading to its conclusion that Gaines had met his burden of showing a substantial change in circumstances. The facts considered by the court include changes in Gaines's and Scott's employment situations; Scott's withholding information about the child's healthcare, dental needs, and daycare arrangements; and Scott's refusal to share information about her work schedule, which made it difficult to schedule Skype visitation. The court pointed to the "obvious, exceptionally strong dislike" of Gaines that Scott and her parents exhibited and the fact that "all three of them [took] active and/or passive steps to limit Mr. Gaines's visitations and time with [B.G.], . . . despite their words to the contrary." In light of the court's detailed analysis, we conclude there was no abuse of discretion in the court's finding a substantial change in circumstances.

The superior court's analysis and findings regarding the nine best interests factors were similarly detailed and not clearly erroneous. The court carefully considered each of the nine best interests factors, including "the [best interests] findings made at the original hearing," in order to determine whether modification was in the best interests of the child.[39] In the original findings, Scott prevailed with respect to the first, second, and fifth factors, and Gaines prevailed with respect to the sixth factor. In the 2015 findings, neither parent prevailed with respect to the first, second, and fifth factors, and Gaines "strongly, strongly prevail[ed]" with respect to the sixth factor. Neither parent prevailed as to the third, fourth, seventh, and eighth factors; Scott fared poorly with respect to the ninth factor (other pertinent factors).[40] Based on its findings, the court

_____

[39] *Hamilton v. Hamilton*, 42 P.3d 1107, 1115 (Alaska 2002).

[40] Under the ninth factor, the superior court found, among other things, that Scott failed "to cease and desist from any conduct which, either passively or actively, prevents, interferes[] with[,] or unnecessarily limits the greatest possible contact between
(continued...)

modified custody, awarding primary physical custody to Gaines, liberal unsupervised visitation to Scott, and shared legal custody. The best interests findings are not clearly erroneous, and the court did not abuse its discretion in modifying custody.

Scott argues that the superior court erred in concluding that awarding primary custody to Gaines was in the best interests of the child, in finding that Scott "would not facilitate a frequent, loving relationship between" Gaines and the child, and in "placing undue weight on the factor of allowing a relationship and not enough weight on the desirability of maintaining continuity." However, the court's finding "that Mr. Gaines will do just fine in raising [B.G.] and communicating with, facilitating and encouraging the relationship between [B.G.] and Ms. Scott" is well supported by the evidence in the case and is not clearly erroneous. For example, the court made specific findings about Gaines's living situations and daycare plans and noted the fact that Gaines had an approved family care plan. In light of the findings in the court's decision, the court did not abuse its discretion in concluding that awarding primary custody to Gaines was in the best interests of the child.

The superior court's finding that Scott would facilitate the relationship between Gaines and the child "only if she is under very close judicial scrutiny" has substantial support in the record and is likewise not clearly erroneous. Even after the court explicitly ordered Scott "to cease and desist from any conduct which, either passively or actively, prevents, interferes[] with[,] or unnecessarily limits the greatest

---

**40**      (...continued)
the child and [Gaines]" despite the March 2014 order. The court also cited Scott's assertion that she would "fully support facilitating a good relationship between [B.G.] and his father AND father's family, by sticking to the court visitation schedule, and by being flexible and cooperative whenever necessary to achieve good results" and found that Scott was "not capable of doing that," that her statement was not credible, and that she was "anything but flexible and cooperative."

possible contact between the child and [Gaines]," the court found that she failed to comply. The court cited multiple instances of perjury and untruthfulness by Scott "for a single purpose: to not facilitate and encourage visitation." It found that she withheld information requested for visitation and limited what visitation did occur. Thus, the court did not clearly err in finding that Scott "would not facilitate a frequent, loving relationship between" Gaines and B.G.

Finally, the court did not place "undue weight on the factor of allowing a relationship and not enough weight on the desirability of maintaining continuity" in its analysis of the fifth best interests factor. Our decision in *Hamilton* indicates that the fifth factor "requires the court to look to the desirability of maintaining continuity."[41] In *Hamilton* we held that "[t]he trial court did not abuse its discretion by placing too much weight on the ability of [the mother] to allow the children an open and loving relationship with [the father] while not placing enough weight on the continuity and stability of the boys' relationship with [the mother]."[42] In that case, the trial court had not explicitly mentioned continuity and stability as a factor, but we found that the trial court's statement about "not tak[ing] lightly the decision to shift majority custody from the children[']s lifelong primary parent" showed "the trial court understood that continuity of care favored custody remaining with [the mother]."[43] In this case, the superior court likewise recognized that "moving a child from one setting to another should certainly not be done lightly," but it found that Scott's animosity against Gaines and desire to not have Gaines in the picture of raising the child "create[d] an unsatisfactory environment and that it [was] undesirable to maintain that aspect, that

---

[41]     42 P.3d at 1116.

[42]     *Id.* at 1115.

[43]     *Id.* at 1116 (second alteration in original).

continuity." The court also found that Gaines was trying to build his relationship with B.G. rather than pull B.G. away from Scott.[44] Thus the court did not abuse its discretion by "placing undue weight on the factor of allowing a relationship and not enough weight on the desirability of maintaining continuity."

**B.** **The Superior Court Did Not Abuse Its Discretion By Awarding Attorney's Fees To Gaines**.

Scott also argues that it was error for the superior court to award attorney's fees to Gaines and to not award attorney's fees to her. She argues that the court erred in awarding fees without making "explicit findings as to the parties' relative financial resources and whether the parties acted in good faith."[45] However, the order awarding attorney's fees did both: in its order, the court found that Gaines had "a good job, good benefits, and a good future" and that "Scott earn[ed] very little ($1,767 per month, with expenses of $1,447 per month, before food and gas)," and the court incorporated its extensive findings regarding good faith or lack thereof from its July 27 oral decision. She also argues that under public policy it is "manifestly unreasonable" to award attorney's fees against her as the losing party because she was defending an important right. However, she fails to recognize that AS 25.20.115 specifically allows for the award of attorney's fees and costs in "action[s] to modify, vacate[,] or enforce that part of an order providing for custody of a child or visitation with a child." Additionally, she claims that the court erred by not awarding attorney's fees to her, but she does not provide a single argument in support of that claim. Thus, Scott has failed to show any abuse of discretion in the court's award of attorney's fees.

---

[44]  *See id.* (citing the trial court's finding that the father "only wanted to 'pull the children *toward* himself rather than *away from* [the mother]' " (emphasis in original)).

[45]  *See* AS 25.20.115.

## V. CONCLUSION

We AFFIRM the superior court's decision and order modifying child custody and its award of attorney's fees.