NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JERRY GENE LYMBURNER, | ) | |
| | ) | Supreme Court No. S-18440 |
| Appellant, | ) | |
| | ) | |
| v. | ) | Superior Court No. 4FA-19-01573 CI |
| | ) | |
| ASHLEY LEE AXHELM, f/k/a Ashley | ) | MEMORANDUM OPINION |
| Lee Lymburner, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1995 – October 25, 2023 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Earl A. Peterson, Judge.

Appearances: Amy J. Schrum, Golden Heart Law, LLC, Fairbanks, for Appellant. Notice of nonparticipation filed by Amanda M. Lancaster, Law Offices of Blake Fulton Quackenbush, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

A married couple divorced after roughly five years of marriage. They disagreed about custody of their three children, the valuation of a real estate business, whether the business was marital or separate property, the distribution of the marital property, and the amount of child support payments. The trial court awarded the mother

---

\* Entered under Alaska Appellate Rule 214.

sole legal custody and primary physical custody of the children. The court found that the business was a marital asset and valued it at roughly $300,000, crediting the testimony of the mother's expert over the father's expert. The court evenly split the marital property and ordered the father to pay child support. The father appeals, arguing that the trial court erred in all of these rulings.

We conclude that the trial court did not err in its custody award and that its property division was largely proper. However, three aspects of the property division and child support orders require remand. First, the findings are not detailed enough to permit appellate review of the ruling that the business was marital property. Second, no justification was offered for adjusting the standard child support formula by ordering the parties to split the costs of the children's education and extracurricular activities. Third, the child support award is improperly retroactive.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Ashley Axhelm and Jerry Lymburner began dating in 2004, and they remained in an essentially continuous dating relationship until they were married in August 2014. They have three children. Their oldest child has autism and requires regular therapy sessions and special education classes in school.

Most of the parties' income was derived from the businesses that they owned, but the parties' ownership interest of each business is disputed. There are two incorporated businesses: Powered by Lymburner, LLC and Powered by Lymburner LLC, Co. Powered by Lymburner, LLC was incorporated in 2012, and Powered by Lymburner LLC, Co. was incorporated in 2015. In 2013 Jerry obtained a business license for "Powered by Lymburner Realty," which lists him as the sole owner.

The parties used these legal entities for three business ventures. First, they purchased a coffee stand named "Mochalicious" in 2011.[1] Ashley managed the coffee stand's day-to-day activities while Jerry managed the finances and occasionally helped with tasks like plowing snow or buying groceries for the stand. In 2013 Jerry began directing the coffee stand's income and expenses through Powered by Lymburner, LLC until the coffee stand was sold in 2016. Second, Jerry began working as a realtor in 2013, and he directed all of his expenses and income from this work through Powered by Lymburner, LLC. Third, Jerry created a brokerage business in 2015 after he acquired a real estate broker license. This brokerage allowed Jerry to oversee other real estate agents and take a percentage of their sales. As part of his bank's reporting requirements for brokerages, Jerry created Powered by Lymburner LLC, Co. However, Powered by Lymburner LLC, Co. does not handle any funds.

## B.     Proceedings

In March 2019 Ashley filed for divorce. Ashley requested sole legal custody and primary physical custody of the three children. Jerry counterclaimed for joint legal and shared physical custody. In March 2019 the court issued an interim custody order granting joint legal custody and equally shared physical custody.

A piecemeal trial was held over almost a year. Ashley called nine witnesses who testified that she was a good mother who met the children's needs. Five of Ashley's witnesses also testified that Jerry was less able (or unable) to meet the children's needs because he was short-tempered, impatient, or unable to understand how to deal with the children when they were upset. These five witnesses also reported that Jerry did not seem particularly interested in interacting with the children.

---

[1]     There are disputes about whose funds were used to purchase this coffee stand. Jerry claims he purchased it with separate funds, but Ashley maintains that they bought the coffee stand as a joint venture and that Jerry's name was the only one on the paperwork because he handled the finances for the business.

Jerry called three witnesses who testified that he was a good father. Two of these witnesses also testified that Ashley was not a good mother and had physically abused the children, but the trial court found this testimony not credible.

Each party called an expert witness who testified about the proper valuation of the real estate business. Ashley's expert valued the business at roughly $300,000, and Jerry's expert valued the business at roughly $80,000.

At the close of trial, Ashley requested primary physical custody and sole legal custody with a requirement that she consult Jerry on important decisions. She also requested child support pursuant to Alaska Civil Rule 90.3 and a 75/25 split of the marital property. Jerry requested sole legal custody with equally shared physical custody. He requested child support pursuant to Rule 90.3 (with a substantially different accounting of the parties' relative incomes) and a 50/50 split of the marital property.

Several months later the trial court issued its rulings. It awarded Ashley primary physical custody and sole legal custody of the children. After analyzing the best interests factors under AS 25.24.150(c), the court concluded that the children would best be served by primary physical custody with Ashley, with Jerry having visitation from Friday afternoon until Sunday evening three times a month. The court then reasoned that, since the parties could not effectively parent together, one parent needed to have sole legal custody. Because Ashley would have physical custody most of the time, the court concluded that she was the better parent to have this responsibility. However, the court required that Ashley "must first discuss the options with Jerry and get his input . . . [and] take Jerry's input into consideration" before making any major decisions for the children. In a separate order the court increased Jerry's monthly child support obligation to reflect Ashley's increased custody time. The court backdated the increased child support amount to the last day of trial, which had occurred over five months earlier.

The trial court entered a separate order for the division of property. The court accepted Ashley's expert's valuation of Powered by Lymburner LLC at roughly $300,000 and awarded the company and marital house to Jerry. The court also ordered Jerry to make an equalization payment of roughly $130,000 to Ashley, which resulted in a 50/50 property distribution.

Jerry filed a motion for reconsideration. The trial court elaborated on the reasoning for its decision but did not change the outcome.

Jerry now appeals the custody order, property division, and child support award.

## III. DISCUSSION

### A. The Trial Court's Custody Award Was Proper.

When awarding custody the trial court must consider nine factors relating to the child's best interests.[2] "Once a court has identified the best interests factors relevant to its decision, we review the individual findings for clear error and how the factors were balanced for abuse of discretion."[3] A finding of fact "is clearly erroneous when this court is left with a definite and firm conviction that the trial court has made a mistake."[4] A trial court abused its discretion if it "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[5] Jerry makes three arguments attacking the trial court's custody determination: (1) the trial court erred in finding Ashley more credible than him; (2) the trial court improperly

---

[2]     AS 25.24.150(c).

[3]     *Brett M. v. Amanda M.*, 445 P.3d 1005, 1009 n.9 (Alaska 2019) (citing *Blanton v. Yourkowski*, 180 P.3d 948, 951 (Alaska 2008)).

[4]     *Moeller-Prokosch v. Prokosch*, 99 P.3d 531, 534 (Alaska 2004) (quoting *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002)).

[5]     *Id.* (quoting *Hamilton*, 42 P.3d at 1111).

applied the best interests factors; and (3) the trial court improperly considered Jerry's conduct that contributed to the divorce.[6] We disagree with each argument and affirm the custody order.

> **1.** **The trial court did not clearly err when it found Ashley more credible than Jerry.**

Jerry argues that the trial court erred when it credited Ashley's testimony over his. Jerry argues that "the record is devoid of any dishonesty" on his part but contains instances of Ashley being dishonest. He contends these alleged instances include Ashley "repeatedly testif[ying] that she could not recall or did not know facts concerning her refusal to facilitate a relationship between Jerry and the children," Ashley being "evasive when confronted with several exhibits highlighting that she was in fact inhibiting the children's relationship with their father," and Ashley lying about contributing money to Jerry's business.

The evidence Jerry cites to impeach Ashley's credibility is not compelling enough to overcome our deference to the trial court's credibility determinations. First, Jerry is incorrect that the record is "devoid of any dishonesty" on his part. The trial court found that Jerry made allegations about Ashley's mental health that were not credible and conflicted with Ashley's credible testimony about her mental health. Second, most of the impeachment evidence that Jerry points to is Ashley's testimony that she did not recall an event. While these gaps in memory and alleged evasiveness could arise from dishonesty, they could also be innocent lapses in memory. The difference is nearly impossible to tell from the transcripts alone, which is why

---

[6]     Jerry also briefly alleges that the trial court's order violated his due process rights. Jerry does not explain this claim and cites only a single case in support of it. We therefore decline to address it. *See Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

testimonial credibility determinations are the province of the trial court.[7] Third, Jerry's bank statements are not necessarily inconsistent with Ashley's testimony. Ashley testified that she gave Jerry $4,000 for his real estate business's startup costs. Jerry testified that he received $4,000 from Ashley into his personal account — which is separate from the business account — but that he did not remember how that $4,000 was spent. Because money is fungible, Ashley's payment to Jerry's personal account does not "prove" that Ashley did not contribute to the start-up costs of Jerry's real estate business. Given the trial court's finding that Jerry made non-credible statements about Ashley's mental health and the lack of indisputable impeachment evidence, we see no clear error in the trial court's credibility determinations.

### 2. The trial court did not err in applying the best interests factors.

Jerry argues that the trial court erred in its application of certain best interests factors. We disagree.

Jerry challenges the trial court's findings that giving Ashley custody would be better for "the physical, emotional, mental, religious, and social needs of the child[ren]"[8] and that Ashley had a greater "capability and desire" to meet these needs.[9] Jerry argues the trial court "overlook[ed]" multiple pieces of evidence showing that he was a dedicated father to all three children who took additional steps to support their autistic son. If the trial court had not overlooked this evidence, Jerry argues, it would have found that he was equally capable or more capable of meeting the children's needs.

---

[7] *See Curry v. Tucker*, 616 P.2d 8, 12 n.3 (Alaska 1980) (explaining that deference to credibility assessment is warranted because superior court "saw the witnesses testify, heard the inflection of their voices and observed their relative candor in answering questions").

[8] AS 25.24.150(c)(1).

[9] AS 25.24.150(c)(2).

The trial court found that the children have "needs that require continued attention," especially due to the oldest child's autism. The court found that "Ashley has continuously provided" this attention, including by finding programs that help support families of children with autism. Additionally, the court credited witnesses' testimony that Ashley was better able to meet the children's general needs and more interested in doing so.

The record supports the trial court's findings. Multiple witnesses testified about Ashley's superior ability to meet the children's needs and about Jerry's apparent disinterest in the children. Jerry's arguments on appeal highlight the testimony of other witnesses — including his own — who indicated that he would be better able to meet the children's needs. But "[w]here the trial court makes factual findings that . . . are supported by the record, we do not reweigh the conflicting evidence."[10] The trial court's finding that Ashley was better able to meet the children's needs was supported by the record. Thus we affirm the trial court's application of this factor.

Jerry also argues that the trial court erred in finding that "the length of time the child[ren] ha[ve] lived in a stable, satisfactory environment and the desirability of maintaining continuity" favored Ashley.[11] Jerry makes a two-part attack. First, he attacks the court's conclusion that he "has focused more on building his business and building a different life" as factually incorrect. Jerry argues that the trial court's only support for this conclusion is the fact that he left the children with Ashley during his designated time so he could go on vacation, which only occurred a few times. Second, Jerry argues that the trial court's final custody order was disruptive to the children's stability and inconsistent with the interim custody order. He maintains the children

---

[10] *Pasley v. Pasley*, 442 P.3d 738, 752 (Alaska 2019).

[11] AS 25.24.150(c)(5).

were doing well under the interim custody order — which provided for joint custody — and that switching to Ashley having primary custody was disruptive to the children.

The trial court's factual findings about the relative stability of Ashley and Jerry are not clearly erroneous. Multiple witnesses testified to Ashley's dedication to the children and the stability she provided for them. In contrast, multiple witnesses testified that Jerry was very busy growing the real estate business and appeared somewhat disinterested in his children, which is consistent with the notion that the children had less stability while in Jerry's orbit. Further, Ashley documented at least nine episodes where Jerry appeared to voluntarily miss one or more days of scheduled custody time. This evidence is sufficient to affirm the trial court's factual findings.

We also reject Jerry's argument that the shift between the interim custody order's custody allocation and the final custody order's custody allocation was disruptive to the children's stability for purposes of the best interests determination. When entering an interim custody order the trial court must order equally shared physical custody unless it would be "detrimental to the welfare of the child[ren]" or impractical.[12] Requiring courts to give weight to equally shared physical custody under an interim order when considering the "stability and continuity factor" would tilt the scales in favor of a 50/50 custody split in any case with a lengthy period of interim custody, even when there was no evidence that a 50/50 split was in the child's best interests. Interim custody orders are issued before the trial court has heard all of the evidence in the case.[13] For this reason, trial courts are not required to even consider the

---

[12] AS 25.20.070 (stating that interim custody orders must provide child with "equal access to both parents" unless doing so would be impractical, "detrimental to the welfare of the child," or would place the child with a parent with a history of domestic violence).

[13] *Smith v. Weekley*, 73 P.3d 1219, 1224 (Alaska 2003).

interim custody arrangement when fashioning child custody orders.[14]  Likewise, trial courts may not accord presumptive preference to maintaining the interim custody order.[15]  Instead, trial courts must consider all evidence presented at trial and determine which custody arrangement will be best for the children.[16]  Here, the trial court correctly rejected the argument that the interim order was the proper starting point for custody allocation:  just because "the parties were doing just 'fine' with their interim custody schedule, does not determine it was the children's best interest to continue."  The trial court did not err in deciding that the "stability and continuity" factor favored Ashley.[17]

Jerry finally argues that the trial court erred when it found that "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child" weighed equally against both parents.[18]  Jerry argues that this finding stems in large part from the trial court blaming him for the divorce, as seen by the court's use of the term "paramour" to describe his current romantic partner.  He also argues the court incorrectly found that Ashley made equal efforts to facilitate the relationship with Jerry, pointing to evidence that she missed FaceTime calls with him and unilaterally rescheduled the children's appointments.  In contrast, Jerry notes that he emailed Ashley about the children's needs and took parenting classes.

---

[14]  *Id.*  ("[W]hile the superior court may take into account as a factor the period of time between the entry of an initial and a final custody award, there is no requirement that the court do so."); *see also Velasquez v. Velasquez*, 38 P.3d 1143 (Alaska 2002) (reaching same conclusion).

[15]  *Weekley*, 73 P.3d at 1224.

[16]  *Velasquez*, 38 P.3d at 1149.

[17]  AS 25.24.150(c)(5).

[18]  AS 25.24.150(c)(6).

Jerry's arguments are unpersuasive. First, as described in more detail below, the trial court does not appear to have blamed Jerry for the divorce, and its use of the term "paramour" was inartful, not malicious. Second, the trial court's finding that Jerry was less willing to facilitate a relationship between the children and Ashley was not clearly erroneous. Each parent alleged that the other parent instigated disrespectful communications. The parents required the court to intervene to settle relatively simple matters, such as how the children would be exchanged and where the school bus would pick up the school-aged children. These motions, as well as the parents' testimony, reveal clear animosity. Jerry's arguments on appeal ignore this evidence and instead focus solely on the evidence crediting his claim. Once again, we decline to reweigh the trial court's assessment of this conflicting evidence, and we conclude that the trial court's factual finding was not clearly erroneous.[19]

### 3. The trial court did not consider improper factors when awarding custody of the children.

Jerry argues that the trial court faulted him for causing the divorce and improperly considered this as a factor when determining custody of the children. Jerry highlights two aspects of the court's order: (1) the court's finding that Jerry "lacks a stable, satisfactory environment" because "the testimony illustrated that Jerry has focused more on building his business and building a different life" and (2) the court's use of the term "paramour" in reference to his new partner, both in its initial order and on reconsideration, after Jerry objected to the term.

We disagree. The trial court's findings about Jerry being "focused more on building his business and building a different life" were directed at his conduct *after* separation, not before it. When placed in context, the court's comments do not indicate

---

[19] *See Pasley v. Pasley*, 442 P.3d 738, 752 (Alaska 2019) ("Where the trial court makes factual findings that, as here, are supported by the record, we do not reweigh the conflicting evidence.").

that it was blaming Jerry for the dissolution of the marriage or considering the parties' relative fault when determining child custody.

Nor does the trial court's use of the term "paramour" indicate that it was considering fault when determining child custody. The trial court later explained that it used the term simply as a shorthand for Jerry's new romantic partner. The use of the term "paramour" was inartful, but without more the court's use of this term does not indicate that it assigned moral fault to Jerry when deciding custody.[20]

### 4. The trial court did not abuse its discretion in awarding Ashley primary physical custody and sole legal custody.

In addition to arguing that the trial court erred in its findings relating to the best interests factors, Jerry also argues that the trial court abused its discretion in awarding Ashley primary physical custody and sole legal custody. Most of Jerry's arguments that the trial court abused its discretion in awarding Ashley primary physical and sole legal custody are rehashed versions of his arguments that the trial court erred in its best interests findings. In short, he argues that the record shows that Ashley — not he — was unwilling to foster a relationship between the children and other parent. As a result, Jerry concludes that he should have been awarded sole legal custody or joint legal custody and either primary or equally shared physical custody.

The trial court did not abuse its discretion in awarding Ashley primary physical custody. As discussed above, the trial court's best interests findings were not clearly erroneous. Multiple witnesses testified that Ashley was the children's primary

---

[20] However, it is important for courts to avoid even the appearance of bias or impropriety. Alaska Code Jud. Conduct Canon 2(A) ("In all activities, a judge shall exhibit respect for the rule of law, comply with the law, avoid impropriety and the appearance of impropriety, and act in a manner that promotes public confidence in the integrity and the impartiality of the judiciary."). We therefore caution trial courts to carefully consider the language they use to describe the parties and witnesses — especially after a party has alerted the court that they were offended by the court's choice of words.

caretaker and that she was a better and more invested caretaker. Given these facts, it was not an abuse of discretion to award Ashley primary physical custody.

The legal custody ruling was primarily driven by the substantial friction between the two parents, which the trial court worried would result in the parents refusing to compromise, resulting in the children being whipsawed between decisions or frequent court battles. To avoid this, the trial court awarded Ashley sole legal custody because she had physical custody of the children most often.

This was not an abuse of discretion. As discussed above, the trial court's finding that neither parent was willing to facilitate a relationship between the children and the other parent was not clearly erroneous. Both parents alleged that the other instigated disrespectful communications, both parents ignored the other's phone calls out of spite or frustration, and the parents required court intervention to settle minor disputes. Jerry even admits on appeal that "an award of sole legal custody may be appropriate in this case due to the parties' inability to communicate effectively," but he blames Ashley for these difficulties. Given these facts, the trial court was not clearly mistaken when it found that shared legal custody was not tenable. And its decision to award sole legal custody to Ashley, the parent with greater physical custody, based on the likelihood that she would more frequently be faced with making decisions for the children, was not an abuse of discretion.

**B.     The Trial Court's Property Division Requires Remand.**

Jerry argues that the trial court erred in its division of marital property. Property division is a three-step process: (1) determining the property available for distribution; (2) assessing its value; and (3) allocating it equitably.[21] "[T]he characterization of property as separate or marital may involve both legal and factual

---

[21]     *Partridge v. Partridge*, 239 P.3d 680, 685 (Alaska 2010).

-13-                                                                        *1995*

questions."[22]  "Underlying factual findings as to the parties' intent, actions, and contributions to the marital estate are factual questions."[23]  But the ultimate determination of whether property is separate or marital is a legal question.[24]  The valuation of property is a factual determination that is reviewed for clear error.[25]  The equitable division of marital property is reviewed for abuse of discretion.[26]

>    **1.  The trial court's findings are not detailed enough for us to review its ruling that the real estate business was a marital asset.**

Jerry argues that the trial court erred when it classified his real estate business as marital property, rather than separate property.  Because there are insufficient findings by the trial court on this issue, we remand for additional findings.

The first step in any property division is determining what property will be divided between the parties.[27]  Property is either marital or separate.  Marital property includes all property acquired during the marriage, "excepting only inherited property and property acquired with separate property which is kept as separate property."[28]  A spouse's premarital separate property can become marital through transmutation or active appreciation.[29]  Transmutation occurs when it is "the intent of the owning spouse that his or her separate property be treated as marital property for the purpose of

---

[22]  *Brennan v. Brennan*, 425 P.3d 99, 104-05 (Alaska 2018) (alteration in original) (quoting *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013)).

[23]  *Beals*, 303 P.3d at 459.

[24]  *Id.*

[25]  *Partridge*, 239 P.3d at 685.

[26]  *Id.*

[27]  *Lundquist v. Lundquist*, 923 P.2d 42, 47 (Alaska 1996).

[28]  *Lewis v. Lewis*, 785 P.2d 550, 558 (Alaska 1990).

[29]  *Harrower v. Harrower*, 71 P.3d 854, 857 (Alaska 2003).

dividing property in the event of a divorce."[30]  When considering the argument that separate property transmuted, the court must look for "an intent to 'donate' or 'convey' separate property to the marital unit or marital estate."[31]  "Active appreciation occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage."[32]

Jerry argues that the real estate business he founded is separate property because (1) he founded the business as a sole-ownership entity before getting married, (2) he kept this sole-ownership structure throughout the marriage, and (3) the business grew primarily (if not exclusively) due to his own efforts.  Jerry acknowledges that he formed a related business offering brokerage services during the marriage, but he argues that this entity was a legal formality and that "the existing premarital business merely expanded to offer more advanced services in line with Jerry's new broker's license."

The trial court treated all of the incorporated businesses and ventures as a single, unified entity.  The court found that the real estate business was started during the marriage and that Ashley substantially contributed to it by working for it without pay and by taking care of the children and household so that Jerry could focus on the business.

We cannot decide if the trial court's property classification was error because there are not detailed findings supporting its ruling.  First, the court does not distinguish between the two companies potentially at issue:  Powered by Lymburner, LLC and Powered by Lymburner, LLC, Co.  Second, the court does not distinguish between the three business activities that Powered by Lymburner LLC and Powered by Lymburner LLC, Co. have engaged in:  (1) the coffee stand; (2) Jerry's time as a real

---

[30]  *Kessler v. Kessler*, 411 P.3d 616, 619 (Alaska 2018).

[31]  *Id.*

[32]  *Id.* (quoting *Harrower*, 71 P.3d at 857-58).

estate agent for another brokerage; and (3) Jerry's brokerage. Nor does the trial court consider how each of these activities contributed to the business' ultimate valuation. Instead the trial court's order treats all of these entities and activities as a single, unified business. But treating all of the business entities and ventures as a single unit makes some of the trial court's key factual findings clearly erroneous. For example, the trial court found that Jerry's business was started during the marriage. But Powered by Lymburner, LLC — the core business — was formed in 2013, before the couple was married. Likewise, Jerry started working as a realtor and passed his real estate expenses and profits through Powered by Lymburner, LLC before the couple was married. Because of these facts, the trial court's finding that "[t]he business was started during the marriage" is clearly erroneous.[33]

The testimony supports a number of possible outcomes on remand. For example, there is evidence supporting the claim that Powered by Lymburner, LLC is Jerry's separate property and the brokerage venture that began in 2015 was a mere expansion of Jerry's ongoing, separate-property business, meaning the brokerage is separate property.[34] Similarly, the evidence also could support the claim that Powered by Lymburner, LLC is Jerry's separate property but the brokerage venture was a new business that was established during the marriage and therefore is presumptively marital property.[35] Alternatively, there is evidence suggesting that Powered by Lymburner, LLC was started as a joint venture between Jerry and Ashley, meaning each owns some

---

[33] We express no opinion on the separate factual question of whether the brokerage venture — which was started after the marriage — was a separate business started during the marriage or just an expansion of the existing realty venture.

[34] *See Thiele v. Thiele*, 473 P.3d 327, 335 (Alaska 2020) (affirming trial court's finding that clinic opened during marriage was separate property because it was an expansion of husband's established, separate property business).

[35] *See Lewis v. Lewis*, 785 P.2d 550, 558 (Alaska 1990) (holding that property acquired during marriage is presumptively marital).

fraction of the company as separate property. On remand, the trial court should enter factual findings about the ownership of each relevant business entity and business venture (1) before the marriage; (2) during the marriage; or (3) upon separation.

If the court concludes that the real estate business was Jerry's separate premarital property, the trial court should then apply the tests for transmutation or, in the alternative, active appreciation of the separate property. The trial court's ruling implies that it believed that the value of the businesses rose due to active appreciation. But the trial court did not apply the legal framework for active appreciation and did not make the factual findings necessary for us to understand its reasoning, such as the amount that the business appreciated in value due to the efforts of the spouses. For these reasons we remand for additional findings.[36]

### 2. The trial court did not err when it found Ashley's business valuation expert more credible than Jerry's.

Jerry argues that the court erroneously found Ashley's expert's assessment on business valuation more credible than his expert. Jerry maintains that his expert had substantially more experience valuing real estate companies, meaning that his valuation was more accurate and credible. The "determination of credibility between competing experts is a factual finding, which we review for clear error."[37]

The trial court credited Ashley's expert for five main reasons. First, Ashley's expert considered multiple years of the realty business's income, while Jerry's expert just considered the past 12 months. Second, Ashley's expert's valuation was based on evidence that was "testable in court," while Jerry's expert did not provide a detailed financial analysis to support his valuations, which prevented the court from

---

[36]     *See Roberts v. Brooks*, 649 P.2d 710, 712 (Alaska 1982) (reversing because "[t]he [trial] court made no subsidiary findings which would enable us to understand the steps by which it reached this ultimate conclusion").

[37]     *In re Adoption of Sara J.*, 123 P.3d 1017, 1032 (Alaska 2005).

double-checking his work. Third, Ashley's expert demonstrated that she was familiar with "the innerworkings of the business," while Jerry's expert's portrayal of the business conflicted with other witnesses' portrayal of the business, indicating he was not knowledgeable about this specific business. Fourth, Ashley's expert used multiple methods of estimating value and cross-referenced the income figures across multiple sources, whereas Jerry's expert did not have similar "safeguards" in his analysis. Fifth, the trial court noted that Jerry's expert had more general experience in estimating business values, but Ashley's expert had the same experience in evaluating *Alaskan* business values.

The trial court's decision to credit Ashley's expert was not clear error. Both experts agreed that the company's value could be determined by the income capitalization method. "The income capitalization method involves three steps: (1) an estimate of the income which the property is capable of producing, including both periodic income and the income to be derived from future sale of the property; (2) an estimate of the rate of return (capitalization rate) an investor would require in order to induce him to make an investment with the risk and lack of liquidity of an equity interest in the particular property; (3) an application of this capitalization rate to the estimated income to derive the present value of the estimated income."[38]

The experts disagreed on what the business's income was and what an appropriate capitalization rate was. Ashley's expert determined that Jerry's real estate business was receiving roughly $100,000 in net cash flow each year. Ashley's expert determined that a capitalization rate of 24.13% was appropriate. This capitalization rate was reached by starting with the rate for "[r]isk free" government bonds, then adding a risk premium for equities, another risk premium for small businesses, and finally a

---

[38] *Horan v. Kenai Peninsula Borough Bd. of Equalization*, 247 P.3d 990, 995 (Alaska 2011) (quoting *Dash v. State*, 491 P.2d 1069, 1071 (Alaska 1971)).

"subjective risk premium" — which was meant to capture the extra risk of a real estate brokerage.[39] Applying the capitalization rate to the business's net cash flow created a gross value of roughly $435,000. Ashley's expert then reduced this value by roughly 20% because a substantial portion of the cash flow came from Jerry's personal sales and reduced that figure by an additional 10% for lack of marketability because it would be difficult to sell a small brokerage in the Fairbanks area. This resulted in a final estimate of roughly $300,000. Additionally, Ashley's expert compared this figure with comparable sales of real estate companies in the United States and determined that other real estate businesses of this size were also selling for similar amounts with similar earnings multipliers. From these two estimates, Ashley's expert concluded that the fair market value of Jerry's business was roughly $300,000.

Jerry's expert determined that there was substantially less net cash flow and that the appropriate capitalization rate was 50 percent.[40] Jerry's expert determined that the real estate business had a net income of roughly $180,000 in the year of data he reviewed. But Jerry's expert concluded this income was artificially inflated by Jerry's owner-based compensation structure. Jerry did not take a commission for his sales. Instead, he received his compensation through salary or dividends. But after selling the company, Jerry would become an employee and would receive a commission instead.[41]

---

[39] Specifically, Ashley's expert assigned a 2.84% interest rate for government bonds, a 9.81% premium for equities, a 5.68% premium for microcaps, and an 8.00% subjective risk premium. She then totaled these numbers and subtracted the business's long-term growth rate (2.20%) for a total of 24.13%.

[40] The expert did not explicitly assign a capitalization rate, but the expert assigned an income multiplier of 2, which mathematically requires this capitalization rate.

[41] The expert also considered a scenario where Jerry left the business and did not compete with it. Under this scenario, the expert assumed that only one-third of the clients attributable to Jerry would continue to use the business, resulting in an even lower valuation.

The expert calculated that the net effect of this change would reduce the business's net income to roughly $42,500. Jerry's expert assigned a capitalization rate of 50% to the business but did not provide a mathematical breakdown of how this multiplier was reached. Instead, the expert discussed the general risks of residential brokerages — including the fact that brokerages are dependent on their agents' personal relationships with clients, the "highly seasonal and cyclical" nature of real estate markets, and general factors such as "the size and geographic location of the firm" and "the growth characteristics of the market where the firm operates" — before concluding that this capitalization rate was appropriate.

The trial court did not clearly err in crediting Ashley's expert over Jerry's. Ashley's expert presented a reasonable conclusion derived from the same methodology that Jerry's expert used, with substantial evidence to back it up. Jerry's expert conceded that Ashley's expert's evaluation was "an appropriate technical exercise in determining value." Additionally, Ashley's expert's earnings multiplier was challenged on cross-examination, and her explanation of her methodology was reasonable. As a result, the trial court did not clearly err when it found that Ashley's expert was more credible than Jerry's.[42]

---

[42] *See Gabaig v. Gabaig*, 717 P.2d 835, 842 (Alaska 1986) ("We have refused to set aside a valuation supported by expert testimony, even though it was contradicted by another expert." (citing *Hunt v. Hunt*, 698 P.2d 1168, 1170-71 (Alaska 1985))).

3.      **Any failure to sufficiently explain the allocation of marital assets or consider Ashley's earning potential when allocating assets was harmless.**

The final step in marital property division is to equitably allocate the marital property.[43] Jerry argues the trial court made three errors in its general division of marital property. First, he argues that the trial court did not sufficiently justify its deviation from an equal split of the marital assets. Second, he argues that the trial court did not make sufficient findings to support its unequal division of the marital property. Third, he argues that the court improperly ignored Ashley's "underemployment" when dividing the assets. Jerry asserts that if the trial court had not made these errors, he would be entitled to an equal portion of the marital estate. To the extent the trial court failed to describe its reasoning or to account for Ashley's underemployment, any such error is harmless because the trial court *did* equally divide the marital property.

Although the trial court did not explicitly state a percentage split of the marital estate, the property division spreadsheet indicates it intended an equal split. The spreadsheet lists each item, its value, and the party who received it. At the end of the spreadsheet, the values awarded to each party are totaled. These totals — along with the ordered equalization payment — indicate that the trial court intended an equal split of the marital property, which is presumptively equitable and is what Jerry is requesting.[44] Jerry does not challenge the trial court's calculations of the marital estate or its distribution of any asset (other than his business), and he appears to argue for a 50/50 distribution of property. Thus, Jerry is incorrect that the trial court deviated from

---

[43]     *Partridge v. Partridge*, 239 P.3d 680, 685, 688 (Alaska 2010); *Merrill v. Merrill*, 368 P.2d 547, 548 & n.4 (Alaska 1962) (listing equitable factors that trial courts should consider when dividing marital property).

[44]     The total net equity for Jerry is listed as $463,055 and the total net equity for Ashley is listed as $191,778. The court ordered Jerry to make an equalization payment of $135,638, which would leave each party with $327,416.

an equal division of the assets. Any failure by the trial court to sufficiently explain its property distribution, apply the *Merrill* factors,[45] or consider Ashley's earning potential was therefore harmless, because the trial court already awarded Jerry the property distribution that he seeks.

> **4.** **The trial court did not abuse its discretion by ordering Jerry to make an equalization payment.**

Jerry argues that the trial court abused its discretion when it ordered him to refinance his home to make an equalization payment to Ashley "without adequately hearing evidence regarding his ability to do so." Jerry argues that he is unable to fully comply with the order, because "most banks will not allow homeowners to exceed an 80% loan to value to secure a cash-out refinance." Jerry claims he did not present the court with any additional information on this point because "there was no indication by the court that such information was necessary."

"Cash awards are a permissible means of dividing illiquid marital assets where they would not impose a hardship on the paying party."[46] A trial court's structuring of a cash equalization payment is reviewed for abuse of discretion.[47] Here the trial court clarified, in its order denying reconsideration, that Jerry could satisfy the equalization payment by means other than refinancing the house. Thus Jerry is incorrect that the court ordered Jerry to refinance the marital home "without adequately hearing evidence regarding his ability to do so." Instead the court ordered Jerry to make

---

[45] *Merrill*, 368 P.2d at 548 & n.4 (listing factors that trial courts should consider when dividing marital property).

[46] *Fortson v. Fortson*, 131 P.3d 451, 459 (Alaska 2006).

[47] *Tomal v. Anderson*, 426 P.3d 915, 927 (Alaska 2018).

an equalization payment, which he could finance as he chose. This was not an abuse of discretion.[48]

## C. The Child Support Order Requires Remand.

Jerry challenges the trial court's child support order. "We reverse child support awards only if the superior court abused its discretion or applied an incorrect legal standard."[49] "Whether the superior court applied the correct legal standard to its child support determination" and "[t]he proper method of calculating child support" are questions of law that we review de novo.[50]

Jerry argues that the trial court erred in three ways: (1) it unjustifiably deviated from the standard support formula by ordering the parties to split the children's educational expenses; (2) it undercounted Ashley's income; and (3) its award was improperly retroactive. The first and third arguments have merit. The second argument does not.

### 1. It was error to order the parents to split the children's educational expenses without explanation.

On appeal Jerry argues that the trial court erred when it ordered him to split the costs of the children's "schooling and educational endeavors" as well as "the children's extracurricular activities" in addition to his child support payments. Jerry argues that these costs are already factored into the child support calculation, meaning that the trial court could only order them "for good cause upon proof by clear and

---

[48]    *See id.* at 926-27 (approving equalization payment order for portion of pension fund where court allowed defendant to choose between liquidating pension fund, "tak[ing] out another loan[,] or find[ing] some other source of funds").

[49]    *Koller v. Reft*, 71 P.3d 800, 804 (Alaska 2003) (citing *Beaudoin v. Beaudoin*, 24 P.3d 523, 526 (Alaska 2001)).

[50]    *Wyman v. Whitson*, 421 P.3d 99, 101 (Alaska 2018) (first quoting *Limeres v. Limeres*, 320 P.3d 291, 295 (Alaska 2014); and then quoting *Swaney v. Granger*, 297 P.3d 132, 136 (Alaska 2013)); *Faulkner v. Goldfuss*, 46 P.3d 993, 996 (Alaska 2002).

convincing evidence that manifest injustice would result if the support award were not varied."[51] Alternatively, Jerry argues that the court failed to sufficiently describe its findings to allow for appellate review because any variance from Civil Rule 90.3 must be supported by detailed findings.

Jerry is correct. Under Civil Rule 90.3 any deviation from the child support formula must be justified in writing by "good cause upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied."[52] Education expenses and extracurriculars are part of the normal costs of raising a child that Civil Rule 90.3 already takes into account.[53] Ordering the parents to split these costs in addition to child support required a written justification. But the trial court did not provide any written explanation for deviating from the rule's formula. We therefore remand for the trial court to provide a written justification for this deviation or to strike it.

### 2. The trial court did not err in calculating Ashley's income.

On appeal Jerry renews his argument that the trial court underestimated Ashley's income by (1) failing to consider either Ashley's "voluntary" decision to remain unemployed and (2) failing to fully account for Ashley's rental income.

When calculating a parent's income the trial court must determine if a parent is "voluntarily and unreasonably . . . unemployed or underemployed."[54] But the trial court heard evidence of Ashley's employment status and found, on reconsideration,

---

[51] Alaska R. Civ. P. 90.3(c)(1).

[52] *Id.*

[53] *Boone v. Boone*, No. S-18412, 2023 WL 4921561, at *8 (Alaska Aug. 2, 2023) ("An order of equally shared educational and extracurricular expenses, in addition to payment of child support calculated under Civil Rule 90.3, constitutes a deviation from the standard child support award . . . .").

[54] Alaska R. Civ. P. 90.3(a)(4) & cmt. III.C.

that she was not underemployed because she was employed part-time and her childcare responsibilities as primary custodian did not leave her as much time to work.

The trial court's finding was not clearly erroneous. At the time of the trial, Ashley stated she made $20,000 working part time at a restaurant. She also managed four rental units. Ashley stated she was not seeking more involved employment because she wanted to prioritize taking care of her three children — then seven, five, and two years old. Given the young age of the children and Ashley's part-time employment and property management duties, the trial court did not clearly err in concluding Ashley was not underemployed.

Separately, Jerry challenges the trial court's failure to impute more rental income to Ashley for her ownership of rental properties. "In determining earning capacity under Alaska Civil Rule 90.3, a trial court has the discretion to choose 'the best indicator of . . . future earning capacity' based on the evidence before it."[55] The trial court's final child support order appears to be based on Ashley's most recent child support affidavit. This affidavit describes Ashley's income in 2021 and was filed in November of that year. It reports $12,000 in rental income for that year. The trial court's reliance on Ashley's affidavit for the rental income was reasonable. Therefore the trial court did not err by failing to impute more income to Ashley.

### 3. It was error to make Jerry's increased child support obligation effective five months before the change in custody on which increased support was premised.

Jerry argues that the trial court improperly ordered retroactive child support. When the trial court awarded Ashley primary physical custody, it increased Jerry's support amount accordingly. Under the interim custody ordered entered in 2019, the parties had equally shared physical custody, and Jerry's child support

---

[55]    *Koller v. Reft*, 71 P.3d 800, 805 (Alaska 2003) (quoting *Virgin v. Virgin*, 990 P.2d 1040, 1049 (Alaska 1999)).

obligation had been roughly $2,500 per month. In the final custody order dated April 8, 2022, the court awarded Ashley primary physical custody and increased Jerry's child support obligation to $3,465 to reflect this change. But the court made this increased amount of support effective October 27, 2021 — the last day of the trial.

Jerry objected to the child support calculation, arguing that the court had improperly made a retroactive modification of child support. The court did not rule on the objection. Jerry then moved for relief from judgment under Alaska Civil Rule 60(a), arguing that the court must have made a clerical error because it would have been legally improper to retroactively order increased child support. Ashley opposed.

The trial court rejected Jerry's motion, citing our decision in *Boone v. Boone*.[56] In that case we held that when a court modifies child support, it should generally make the modification effective on the date the moving party sought modification; doing so is not impermissibly retroactive.[57] The trial court reasoned that Ashley had effectively moved to modify child support on the last day of the custody trial by seeking primary physical custody and a corresponding amount of child support:

> Truly, the mother did not file a written motion for modification of support before trial, but she did move for modification, orally, during trial, when she argued that she should have primary physical custody and support. The petition was complete when both sides fully presented their arguments and had opportunity to cross-examine and present rebuttal. Therefore, the mother's completed petition occurred on the last day of trial regarding custody and support, October 27, 2021. The fact that the Court ultimately granted the petition a few months later does not change the effective date.

---

[56] 960 P.2d 579 (Alaska 1998).

[57] *Id.* at 585-86; *accord* Alaska R. Civ. P. 90.3(h)(2) ("A modification which is effective on or after the date that a motion for modification . . . is served on the opposing party is not considered a retroactive modification.").

Jerry sought reconsideration of the court's order denying relief from judgment, arguing the court had misapplied the law. But the court did not grant the motion, allowing it to be denied by operation of law.[58] Jerry moved to supplement the record on appeal to include documents related to this motion, and we granted the motion.

The trial court erred by making Jerry's increased child support obligation effective before the change in custody on which increased support was based. The court's reliance on *Boone* was misplaced. *Boone*'s rule — that an order modifying child support should be effective on the date the party moved to modify support — presumes that the change of circumstances justifying modification existed at the time the parent filed the motion.[59] But *Boone* did not change the underlying rule that child support can be modified only if there is a substantial change in circumstances.[60]

Although it was not error to treat Ashley's argument for modified custody as a de facto motion to modify support, it was error to make the increased support obligation effective before the change in custody actually occurred.[61] In this case there was no substantial change in circumstances until the court awarded Ashley primary physical custody on April 8, 2022, superseding the interim custody order under which

---

[58]     *See* Alaska R. Civ. P. 77(k)(4).

[59]     *See Boone*, 960 P.2d at 585 ("The needs of the children, upon which the court focuses in determining whether a substantial and continuing change of circumstances has occurred, are examined as of the date the petition is filed." (quoting *Kruse v. Kruse*, 464 N.E.2d 934, 939 (Ind. App. 1984))).

[60]     Alaska R. Civ. P. 90.3(h) ("A final child support award may be modified upon a showing of a material change of circumstances as provided by state law.").

[61]     In *Geldermann v. Geldermann*, 428 P.3d 477 (Alaska 2018), we held that when "a parent moves to modify custody based *on an existing, de facto custody change*, the prohibition on retroactivity does not bar the superior court from making a corresponding change in child support effective from the date the modification motion is served on the opposing party." *Id.* at 485 (emphasis added). The difference in this case is that the change in custody justifying a change in child support did not occur until the court entered its final custody order.

the parties exercised shared custody.  By backdating the increased child support award to the last day of trial, the trial court required Jerry to pay increased child support for over five months before any change in circumstance occurred.  Doing so was error.  We therefore vacate this portion of the support order and remand for further proceedings.

## IV.    CONCLUSION

We AFFIRM the trial court's custody order.  We VACATE the trial court's property division and child support orders and REMAND for further proceedings consistent with this opinion.